**U.S. STEEL GROUP—A UNIT OF USX CORPORATION, and Bethlehem Steel Corporation, Plaintiffs,**

**v.**

**The UNITED STATES, Defendant,**

**and**

**AG Der Dillinger Hüttenwerke, Defendant–Intervenor.**

**Slip Op. 98–96.**
**No. 97–05–00866.**

United States Court of
International Trade.

July 7, 1998.

Dewey Ballantine LLP, (Michael H. Stein, Bradford L. Ward, and Jennifer Danner Riccardi ), Washington, DC, for Plaintiffs.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, (Delfa Castillo ), Trial Atty. Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, Bernd G. Janzen, Attorney–Adviser, Office of Chief Counsel for Import Admin., U.S. Dept. of Commerce, of counsel, Washington, DC, for Defendant.

LeBoeuf, Lamb, Greene & MacRae, L.L.P., (Pierre F. de Ravel d'Esclapon, Mary Patricia Michel, and William C. Sjoberg ), Washington, DC, for Defendant–Intervenor.

### *OPINION*

RESTANI, Judge:

This matter is before the court on U.S. Steel Group's, a Unit of USX Corporation, and Bethlehem Steel Corporation's (collectively "Domestic Producers") and AG der Dillinger Hüttenwerke's ("Dillinger") cross-motions for judgment on the agency record, pursuant to USCIT R. 56.2. Under review are the Department of Commerce's ("Commerce") final results in the second antidumping duty administrative review of *Certain CutTo–Length Carbon Steel Plate from Germany*, 62 Fed.Reg. 18,390 (Dep't Commerce 1997) (final results) [hereinafter *"Final Results "*].

Before the court, the Domestic Producers raise the following arguments: (1) Commerce incorrectly calculated the ratio applied to total actual profit in calculating constructed export price ("CEP"), and (2) Commerce erred in failing to deduct antidumping ("AD") and countervailing ("CVD") duties from CEP. Dillinger, in its motion, raises the following arguments: (1) Commerce erred in its classification of Dillinger's U.S. sale as a CEP sale, and (2) even if Commerce properly classified Dillinger's U.S. sale as a CEP sale, it erred by deducting related party commissions in the CEP calculation.

### I. FACTS

**A. Procedural Background**

On August 19, 1993, Commerce published an antidumping duty order on, *inter alia,* certain cut-to-length carbon steel plate from Germany. *Certain Hot–Rolled Carbon Steel Flat Products, Certain Cold–Rolled Carbon Steel Flat Products, Certain Corrosion–Resistant Carbon Steel Flat Products and Certain Cut–to–Length Carbon Steel Plate from Germany*, 58 Fed.Reg. 44,170, 44,171 (Dep't Commerce 1993) (orders). The final margin imposed on Dillinger pursuant to that order

was thirty six percent. *Id.* Commerce subsequently conducted an administrative review of Dillinger's sales, which resulted in an antidumping duty of 2.61%. *Certain Cut–To–Length Carbon Steel Plate from Germany,* 61 Fed.Reg. 26,159, 26,160 (Dep't Commerce 1996) (amended final results).

On August 16, 1995, Dillinger requested a second administrative review of its sales of certain cut-to-length carbon steel plate during the period of review ("POR"), from August 1, 1994 through July 31, 1995. *Letter from Leboeuf, Lamb, Greene & MacRae L.L.P. to the U.S. Department of Commerce* (Aug. 16, 1995), at 1, P.R. 2, D.P.App., Tab 1, at 3. On September 8, 1995, Commerce published a notice initiating the second administrative review of the antidumping duty order on certain cut-to-length carbon steel plate from Germany. *Cold–Rolled and Corrosion Resistant Carbon Steel Flat Products and Certain Cut–To–Length Carbon Steel Plate from Various Countries,* 60 Fed.Reg. 46,817, 46,817 (Dep't Commerce 1995) (notice of initiation).

On October 4, 1996, Commerce preliminarily determined that there was no margin of dumping for Dillinger, and classified Dillinger's sale as an export price ("EP") transaction. *Certain Cut–to–Length Carbon Steel Plate from Germany,* 61 Fed.Reg. 51,907, 51,907–08 (Dep't Commerce 1996) (prelim.results) [hereinafter *"Preliminary Results"*]. At a hearing on November 22, 1996, both sides extensively discussed the characterization of Dillinger's U.S. sale as EP and other issues. *U.S. Department of Commerce Public Hearing Transcript* (Nov. 22, 1996), at 4–41, P.R. 93, D.P.App., Tab 8, at 30–67. Commerce issued its *Final Results* on April 15, 1997, categorizing Dillinger's U.S. sale as a CEP sale and calculating a final margin of three percent. *Final Results,* 62 Fed.Reg. at 18,391, 18,395.

### B. Domestic Producer's Motion

#### 1. Movement Expenses in CEP Profit Calculation

Because Commerce determined in the *Final Results* that Dillinger's U.S. sale was a CEP transaction, 62 Fed.Reg. at 18,391, Commerce made adjustments pursuant to 19 U.S.C.A. § 1677a(d) (West Supp.1998), including reducing the price used to establish CEP by the profit allocated to expenses described in § 1677a(d)(1) and (2).[1] Thus, Commerce calculated the total U.S. expenses component of the profit allocation ratio by summing U.S. commissions, U.S. direct expenses (credit), U.S. indirect expenses, and U.S. inventory carrying costs which become the numerator in a percentage applied to total actual profit. *See U.S. Department of Commerce Internal Memorandum from N. Decker to the File* (Apr. 2, 1997), at 2, P.R. 97, D.P.App., Tab 9, at 49 [hereinafter *"Analysis Memorandum"*]. Movement expenses were not included in this uncontested calculation.

In calculating the total expenses component for the denominator of the applicable percentage, Commerce summed Dillinger's total cost of goods sold (general and administrative expenses, interest expenses, packing expenses, and cost of manufacture) and total selling expenses (direct expenses, commissions, and indirect selling expenses). *Id.* at 3, D.P.App., Tab 9, at 50. Commerce also included total *movement expenses* (total U.S. and home market movement expenses). *Id.* Domestic Producers challenge this approach, of including movement expenses in the denominator but not in the numerator of the "applicable percentage," as contrary to the statute and non-proportional.

#### 2. Deduction of Antidumping and Countervailing Duties from CEP

Section 1677a(c)(2)(A) of Title 19 provides that the price used to establish EP and CEP shall be reduced by "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties." 19 U.S.C.A. § 1677a(c)(2). Before the agency, Domestic Producers argued that Commerce must deduct actual antidumping and countervailing

---

1. Adjustments under 19 U.S.C.A. § 1677a(c) are made to both EP and CEP sales. Section 1677a(d) applies to CEP sales only.

duties from the price used to establish EP or CEP. *Final Results,* 61 Fed.Reg. at 18,394. Relying on the language of the statute and the legislative history, Domestic Producers argued that the phrase "any ... United States import duties" includes AD and CVD because such duties are "incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States." *Id.*

Commerce rejected Domestic Producers' argument, noting its longstanding position that AD and CVD duties are not a cost within the meaning of § 1677a(c)(2)(A). *Id.* at 18,395. Specifically:

> AD and CVD duties are unique. Unlike normal duties, which are an assessment against value, AD and CVD duties derive from the margin of dumping or the rate of subsidization found. Logically, AD and CVD duties cannot be part of the very calculation from which they are derived.

*Id.* Commerce concluded that such double counting, i.e., accounting for the same unfair trade practice twice is unjustifiable. *Id.* Domestic Producers challenge this reasoning.

## C. Dillinger's Motion

### 1. EP v. CEP Sales Classification

From the initial investigation through the first administrative review and the preliminary results of the second administrative review, Commerce has addressed the issue of whether the sales activities of Dillinger's U.S. affiliate, Francosteel Corporation ("Francosteel"), were such that Dillinger's U.S. sales were properly classifiable as EP sales rather than as CEP sales. In all of the previous determinations, Commerce classified Dillinger's sales as EP sales. *Certain HotRolled Carbon Steel Flat Products, Certain Cold–Rolled Carbon Steel Flat Products, Certain Corrosion-resistant Carbon Steel Flat Products and Certain Cut–to–Length Carbon Steel Plate from Germany,* 58 Fed.Reg. 37,-136, 37,139–40 (Dep't Commerce 1993) (final determ.); *Certain Cut–to–Length Carbon Steel Plate from Germany,* 61 Fed.Reg. 13,-834, 13,843 (Dep't Commerce 1996) (final review) [hereinafter *"First Administrative Review"*]; *Preliminary Results,* 61 Fed.Reg. at

51,908. For example, in the *First Administrative Review,* Commerce stated that:

> [a]lthough Francosteel takes title to the merchandise and participates in sales negotiations, we found at verification that it *does not have the flexibility to set the price of the steel* and only acts as a processor of sales-related documentation.

61 Fed.Reg. at 13,843 (emphasis added).

For the first time in the *Final Results* of the second administrative review, Commerce classified Dillinger's sale, an "uncomplicated sale" in Dillinger's processing terminology, as a CEP transaction, stating:

> [i]n the first administrative review, [Commerce]'s determination that Francosteel acted merely as a processor of sales-related documentation was based mainly upon the finding that Francosteel lacked "the flexibility to set the price of the steel." We have determined that this was not the case during the present review.

*Final Results,* 62 Fed.Reg. at 18,392 (citations omitted). Dillinger seeks restoration of EP status.

### 2. Deduction of Commissions in CEP Calculation

Section 1677a(d)(1)(A) of Title 19 instructs Commerce to deduct from the CEP starting price "commissions for selling the subject merchandise in the United States." In the *Analysis Memorandum,* Commerce deducted commissions paid by Dillinger to Daval and Francosteel under the variable "COMMISU." *Analysis Memorandum,* at 1–2, D.P.App., Tab 9, at 48–49.

Commerce investigated the commissions paid by Dillinger to Daval SA ("Daval") and by Daval to Francosteel throughout the second administrative review. Dillinger responded in its questionnaire response:

> Both Daval and Francosteel are related to Dillinger through its parent, Usinor Sacilor.... Dillinger pays Daval [a] percent of the FOB European port value of the plate on all U.S. sales for its services. Daval, in turn pays Francosteel [a] percent of this FOB value.... There are no other intracompany sales commissions ... These payments do not depend on the customer

or class of customer. Nor do these payments depend on the product subcategories or any other criteria. The amounts reported in the computer tape are not allocated. Rather, they are the actual amounts paid.

. . .

Dillinger is unable to prove that the commissions it pays Daval and Francosteel are arm's length transactions. Dillinger does not use any unrelated commissionaires in the U.S. Dillinger also does not have any information indicating what the general industry practice is in the U.S. regarding commissions.

*Dillinger's Questionnaire Response* (Nov. 13, 1995), at 18–19, P.R. 27, Dillinger's App., Tab 3, at 55–56.

Commerce's verification report on U.S. sales reviewed whether commissions paid to Francosteel and Daval in the U.S. market were at arm's-length. *U.S. Sales Verification Report* (June 13, 1996), at 14, C.R. 20, D.P.App., Tab 8, at 47. Commerce concluded that the amount reported is the amount Dillinger pays to Daval and that Daval pays to Francosteel. *Id.* No discrepancies were found. *Id.* Moreover, Commerce noted that "Francosteel stated that they are unable to demonstrate the arm's length nature of commissions as all unrelated sales involve separate buying and selling functions rather than commissioned sales." *Id.*

In the *Preliminary Results,* Commerce categorized Dillinger's U.S. sale as EP and determined that no dumping margin existed for Dillinger. 61 Fed.Reg. at 51,907–08. In the *Final Results,* Commerce changed the categorization of Dillinger's sale to CEP. 62 Fed.Reg. at 18,391. In response to this change, Commerce also deducted commissions paid by Dillinger to Daval and Francosteel from CEP. *See Analysis Memorandum,* at 1–2, D.P.App., Tab 9, at 48–49 (commissions are indicated by variable "COMMISU" and are subtracted from CEP). Dillinger argues this was incorrect given the relatedness of the parties.

## II. JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994), as this is a challenge to a final antidumping duty determination under 19 U.S.C. § 1516a (1994).

In reviewing the final results of an antidumping administrative review, the court must determine whether Commerce's interpretation and application of the antidumping statute is supported by substantial evidence and is in accordance with the law. *See* 19 U.S.C. § 1516a(b)(1)(B).

## III. DISCUSSION

### A. Domestic Producers' Motion

#### 1. Movement Expenses in CEP Profit Calculation

Pursuant to 19 U.S.C.A. § 1677a(d)(3), the price used to establish constructed export price shall be reduced by "the profit allocated to the expenses" described in 19 U.S.C.A. § 1677a(d)(1) (selling expenses) and 19 U.S.C.A. § 1677a(d)(2) (cost of any further manufacture or assembly). For the purpose of § 1677a(d)(3), "profit shall be an amount determined by multiplying the total actual profit by the applicable percentage." 19 U.S.C.A. § 1677a(f)(1). The statute defines the applicable percentage as "the percentage determined by dividing the total United States expenses by total expenses." *Id.* § 1677a(f)(2)(A). Total United States expenses in the applicable percentage are defined as "the total expenses described in subsection (d)(1) and (2) of this section." *Id.* § 1677a(f)(2)(B). It is Commerce's practice to exclude movement expenses from the total U.S. expenses numerator. *See Import Administration Policy Bulletin 97–1,* (Sept. 4, 1997), at 7, Def.'s App., Ex. 1, at 7. Total expenses are defined as "*all* expenses . . . which are incurred . . . with respect to the *production and sale* of such merchandise." 19 U.S.C.A. § 1677a(f)(2)(C) (emphasis added).

Domestic Producers contend that Commerce's inclusion of movement expenses in the "total expenses" denominator is contrary to the express terms of the statute and Commerce's past practice. For this purpose, Domestic Producers contend that total expenses are limited to "all expenses . . . with respect

to the *production and sale* of such [subject] merchandise." *See* 19 U.S.C.A. § 1677a(f)(2)(C) (emphasis added).[2] The Domestic Producers argue that movement expenses are defined separately in 19 U.S.C.A. § 1677a(c)(2)(A)[3], and that this provision covers expenses exclusive of those addressed as selling expenses in 19 U.S.C.A. § 1677a(d)(1), and manufacturing expenses in 19 U.S.C.A. § 1677a(d)(2).[4] Because of this distinction among expenses, Domestic Producers contend that movement expenses cannot be included in the total expense denominator as a subset of production or sales expenses. Furthermore, Domestic Producers contend that Commerce's construction of the statute is unreasonable because it disrupts the symmetry and proportionality between the ratio of total U.S. expenses and total expenses. The court agrees.

In the instant case, the language defining total expenses is not entirely clear as to whether movement expenses should be included in the total expenses denominator.[5] *See* 19 U.S.C.A. § 1677a(f)(2)(C). The stat-ute defines "total expenses" as "all expenses . . . with respect to the production and sale of such [subject] merchandise." 19 U.S.C.A. § 1677a(f)(2)(C). Commerce suggests that the plain language of the statute instructs it to identify "all expenses," including movement expenses, and that the subsequent reference to "production and sale" is no more than a general requirement that the expenses be linked to the subject merchandise.

■ The broad reading of the statute, which Commerce proposes, negates the meaning of the limiting language referring to selling and production expenses. This is no reason to presume Congress included these specifications by happenstance, or only to show that the expenses are linked to the subject merchandise and foreign like product. It likely included the language to mirror the numerator, which is explicitly limited to selling and manufacturing expenses. Thus, one might conclude that the broader structure of the statute, if not the language of the provision itself, resolves the issue in favor of the Domestic Producers' interpreta-

2. Section 1677a(f)(2)(C) reads in its entirety:

(C) Total expenses
The term "total expenses" means all expenses in the first of the following categories which applies and which are incurred by or on behalf of the foreign producer and foreign exporter of the subject merchandise and by or on behalf of the United States seller affiliated with the producer or exporter with respect to the production and sale of such merchandise:
(i) The expenses incurred with respect to the subject merchandise sold in the United States and the foreign like product sold in the exporting country if such expenses were requested by the administering authority for the purpose of establishing normal value and constructed export price.
(ii) The expenses incurred with respect to the narrowest category of merchandise sold in the United States and the exporting country which includes the subject merchandise.
(iii) The expenses incurred with respect to the narrowest category of merchandise sold in all countries which includes the subject merchandise.
19 U.S.C.A. § 1677a(f)(2)(C).

3. Section 1677a(c)(2)(A) defines movement expenses as:

costs, charges, or expenses and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States.

19 U.S.C.A. § 1677a(c)(2)(A).

4. Section 1677a(d)(1) and (2) of Title 19 read:

(d) Additional adjustments to constructed export price
For purposes of this section, the price used to establish constructed export price shall also be reduced by—
(1) the amount of any of the following expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise (or subject merchandise to which value has been added)—
(A) commissions for selling the subject merchandise in the United States;
(B) expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties;
(c) any selling expenses that the seller pays on behalf of the purchaser; and
(D) any selling expenses not deducted under subparagraph (A), (B), or (C);
(2) the cost of any further manufacture or assembly (including additional material and labor), except in circumstances described in subsection (e) of this section.
19 U.S.C.A. § 1677a(d)(1) & (2).

5. Moreover, the Statement of Administrative Action ("SAA") does not support Commerce's position, but neither does it definitively support that of the Domestic Producers.

tion. Assuming *arguendo* that there is some ambiguity, the court considers the reasonableness of Commerce's interpretation.

The arguments Commerce advances in support of its construction of the statute are not persuasive, and the interpretation of total expenses for this purpose, which includes movement expenses, is unreasonable. First, Commerce's interpretation is unreasonable because it conflicts with its past practice of consistently distinguishing between movement and production or selling expenses in other circumstances. *See, e.g., Furfuryl Alcohol from the Republic of South Africa,* 62 Fed.Reg. 61,084, 61,091 (Dep't Commerce 1997) (final results) (classifying expenses incurred for shipping insurance purposes as movement expense and not a direct selling expense); *Silicon Metal from Brazil,* 62 Fed. Reg. 47,441, 47,444 (Dep't Commerce 1997) (amended final results) ("inland freight is a movement expense, and not a selling expense"); *Certain Stainless Steel Wire Rods from France,* 62 Fed.Reg. 7206, 7212 (Dep't Commerce 1997) (final results) (warehousing is a movement expense and not a selling expense).

Second, Commerce incorrectly discounts the proportionality that must logically exist between the total and total U.S. expenses. Total U.S. expenses over total expenses constitutes the applicable percentage. 19 U.S.C.A. § 1677a(f)(1). Logically, the numerator and the denominator of this ratio should be drawn from the same pool of expenses. The SAA implies that such a proportionality should exist. It indicates that the CEP profit deduction should reflect "the proportion which the U.S. manufacturing and selling expenses constitute of the total manufacturing and selling expenses." Statement of Administrative Action, accompanying H.R. Rep. 5110, 103rd Cong., at 824 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3773. Accord-

ingly, the same types of costs should be used in both sides of the ratio. Commerce has not demonstrated that such proportionality should not exist.[6] Therefore, movement expenses may not be included in the denominator of the ratio to be applied to actual total profit.

## 2. Deduction of AD/CVD Duties from CEP

■ Section 1677a(c) of Title 19 lays the framework for calculating the price upon which the antidumping margin is based. The provision calls for Commerce to increase the export and constructed export price by, *inter alia,* "the amount of any countervailing duty imposed on the subject merchandise ... to offset an export subsidy." 19 U.S.C.A. § 1677a(c)(1)(C). Section 1677a(c)(2)(A) specifies that the price should be reduced "except as provided for in paragraph (1)(C)," by:

> the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States.

19 U.S.C.A. § 1677a(c)(2)(A).

Domestic Producers argue that Commerce must deduct actual antidumping and countervailing duties from the price to establish EP or CEP. Relying on the language of the statute and the legislative history, Domestic Producers argue that the phrase "any ... United States import duties" includes AD and CVD duties because such duties are "incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States."

---

**6.** The court was open to any explanation that would support abandonment of proportionality because of unique antidumping concerns. Commerce offered no such reason even when specifically requested to do so, in advance of oral argument. Defendant's attempted delinquent post-argument memorandum provides no answer. It offers no sensible reason why the ratio applied to total actual profit should not be proportional. It assumes the ratio is *disproportion-*

*ate* if movement expenses are excluded from both sides of the ratio. This is not logical. Furthermore, defendant has cited nothing which indicates that total *actual* expenses for determining total actual profit must be defined in the same manner as total expenses for purposes of the ratio. Whether movement expenses are to be included in the actual profit calculation is an issue not before the court.

Specifically, Domestic Producers contend that the failure of the drafters to define "United States import duties" in the Antidumping Act of 1921 indicates that Congress intended only the ordinary meaning for this term, which according to Domestic Producers includes both AD and CVD duties. Additionally, Domestic Producers point to the 1979 Trade Agreement Act's specific exclusion of CVD imposed to offset export subsidies from the reduction to CEP and EP for import duties for support of their claim that AD and CVD duties are included in "United States import duties." Otherwise, the exempting phrase would be redundant. Commerce argues that the addition required by § 1677a(c)(1)(C) lowers the dumping margin by the amount of the export subsidy. Commerce claims that this addition of export-subsidy countervailing duties to the price in the United States cannot be deprived of its logical effect by an offsetting deduction, and this is the sole reason for the reference to export subsidies in § 1677a(c)(1)(c).

Relying on an extension of the holdings of several cases, Domestic Producers also argue that AD and CVD duties should be deducted from U.S. price because the amounts are determinable and not estimates. Furthermore, Domestic Producers claim that Commerce's explanation that such a deduction would result in double-counting is unreasonable because of the clear statutory mandate to deduct AD and CVD duties from U.S. price. Domestic Producers maintain that, even if it were a legitimate policy rationale, the policy cannot apply to countervailing duties which are designed to offset the amount of subsidization benefitting the subject merchandise, and not the amount of price discrimination.

While Domestic Producers' statutory construction arguments raise concerns about Commerce's interpretation, the statute may still be seen as ambiguous and the court will not reject its previous holding in *AK Steel Corp. v. United States*, 988 F.Supp. 594

(C.I.T.1997). The facts and arguments in *AK Steel* as to AD and CVD duties in general are strikingly similar to those in the present case. There, as here, the domestic producers contest Commerce's decision not to deduct antidumping and countervailing duties from U.S. price when calculating the dumping margin. *Id.* at 607. The court held that the term "United States import duties" is not defined, and upheld Commerce's interpretation as reasonable. *Id.*

In doing so, the court rejected the claim that *PQ Corp. v. United States*, 11 CIT 53, 652 F.Supp. 724 (1987) and *Federal–Mogul Corp. v. United States*, 17 CIT 88, 813 F.Supp. 856 (1993), implicitly endorse the deduction of actual antidumping duties. *See AK Steel*, 988 F.Supp. at 608. The court noted Commerce's longstanding policy against such a practice and Commerce's rational concern that a deduction of AD and CVD duties from U.S. price would result in double-counting. *Id.* at 607–08. Double-counting would result if an additional deduction was made from U.S. price for the same AD duties that were used to offset pricing discrimination between the two markets. *Id.* at 607. The court also explicitly stated that Commerce's rationale applied to countervailing duties as well. *Id.* at 607–08.[7] The court stated further that the impermissible double-counting would still result even if antidumping and countervailing duties were defined as falling within "additional costs, charges, and expenses," instead of "United States import duties." *See id.* at 608 n. 12.

Further, in *Hoogovens Staal BV v. United States*, 4 F.Supp.2d 1213 (1998), the petitioners also asked for a remand so that Commerce could deduct antidumping duties as "United States import duties" or other "costs, charges or expenses" from U.S. price. *Id.* at 1216. The court, as in *AK Steel*, held that the definition of the terms "United States import duties" and "costs, charges and expenses" is unclear. *Id.* at 1219–20. The

---

**7.** Note that Article VI(5) of the GATT provides that:

 [n]o product of the territory of any contracting party imported into the territory of any other contracting party shall be subject to both antidumping and countervailing duties to compen-

sate for the same situation of dumping or export subsidization.

As the U.S. antidumping laws are generally intended to be GATT consistent, Commerce's desire to avoid double remedies is legitimate.

court also held that Commerce's decision not to deduct antidumping duties as "United States import duties" or other cost is a reasonable interpretation of the statute in accordance with the law. *Id.* at 1220–21. Echoing the holding in *AK Steel,* the court noted that "Commerce's long-standing policy and practice is not to treat estimated or final antidumping or countervailing duties as import duties or costs under 19 U.S.C. § 1677a(d)." *Id.* at 1219–20.[8]

Domestic Producers respond expressly for the first time in their reply brief that Commerce's rationale does not apply to the treatment of countervailing duties imposed to offset non-export subsidies. The Domestic Producers assert that domestic subsidies are not presumed to have any particular price effect, and are not presumed to have equal price effects in the home and U.S. markets. Accordingly, Domestic Producers argue that Commerce has failed to demonstrate that the deduction of *non-export* CVD duties from U.S. price would result in a double remedy or an impermissible double-counting.

The court has upheld Commerce's interpretation that countervailing duties should not be deducted from U.S. price, based on Commerce's position against double-counting. *See AK Steel,* 988 F.Supp. at 607–08. Domestic Producers ask the court to make a narrow exception to this general rule and find that Commerce's interpretation and rationale are unreasonable as applied to the deduction of countervailing duties designed to offset non-export subsidies.

Based on the information presented, the distinction that Domestic Producers attempt to make between the export and non-export

countervailing duties is not a viable one. The double counting concern is still relevant if Commerce decides to deduct non-export countervailing duties. Logically, the deduction of a countervailing duty, whether export or non-export, from the U.S. price used to calculate the antidumping margin would result in a double remedy for the domestic industry. Commerce has already corrected for the subsidies on the subject merchandise in the countervailing duty order, thereby granting the domestic industry a remedy. To deduct such countervailing duties from U.S. price would create a greater dumping margin, in effect a second remedy for the domestic industry. Therefore, Commerce's rationale for not deducting countervailing duties is reasonable as applied to both export and non-export countervailing duties.

### B. Dillinger's Motion

#### 1. EP v. CEP Sales Classification

In making its determination, Commerce applied the three-part sales classification test developed in response to *PQ Corp. v. United States,* 11 CIT 53, 652 F.Supp. 724 (1987), and followed in *Independent Radionic Workers of America v. United States,* 19 C.I.T. 375, 1995 WL 116219, at *1 (1995).[9] Its conclusion turned on the third prong of the test, whether "the related selling agent located in the United States acts only as a processor of [sales-related] documentation and a communication link between the foreign producer and the unrelated buyer." *Final Results,* 62 Fed.Reg. at 18,391. Thus, the crux of the current controversy, whether the change from EP to CEP was correct, focuses on Dillinger's relationship with Francosteel,

---

**8.** Domestic Producers claim that *AK Steel* is wrongly decided because the court determined the definition of "United States import duties" to be ambiguous without explicitly considering legislative history that would, according to them, prove otherwise. The Domestic Producers cite to the 1921 Antidumping Act. *See* S.Rep. No. 67–16, at 10–14. In doing so, the Domestic Producers admit that the legislative history of the 1921 Act is silent as to the definition of the term "United States import duties." Allegedly this indicates that Congress intended for the phrase "United States import duties" to have its ordinary meaning and thus would include all duties imposed by the United States on imports, such as antidumping and countervailing duties and "cus-

tom duties" identified elsewhere in the statute. Domestic Producers point to *C.J. Tower & Sons v. United States,* 21 C.C.P.A. 417, 71 F.2d 438, 445 (1934), as an example of this interpretation. Domestic Producers' argument is not persuasive, especially in light of their admission that the legislative history is silent as to the definition of "United States import duties." While the language of *C.J. Tower* is supportive, its holding is not on point.

**9.** Dillinger does not challenge the applicability of the *P.Q.* test itself and that issue is not decided here.

and the latter's activity in the sales transaction. The parties rely on the following record evidence in stating their positions.

On October 17, 1995, Dillinger submitted its response to Section A of Commerce's antidumping questionnaire. *See Dillinger's Section A Response* (Oct. 17, 1995), at 1, C.R. 2, D.P. Response App., Tab 1, at 1. Dillinger described the functions performed by Francosteel as the following:

> Francosteel negotiates with the U.S. customer on a case-by-case basis. This applies to both service centers/distributors and end-users. Francosteel is as well responsible for such charges as maritime insurance, customs duty upon entry in the U.S. and U.S. brokerage and wharfage. Some customers require delivery to their plants. Francosteel invoices customers and is responsible for collection of payment. Francosteel serves as the importer of record. Dillinger provides technical service, warranty and other after-sales service, advertising.

*Id.* at 9–10, D.P. Response App., Tab 1, at 15–16. Dillinger explained that "Francosteel has no price list for the American market" and "[p]rices are negotiated with individual customers on a case-by-case basis, relative to the existing market conditions for a given product." *Dillinger's Revised Section A Response* (Oct. 19, 1995), at 13, P.R. 17, Dillinger's App., Tab 2, at 26. Additionally,

> [w]hen negotiating U.S. price, Francosteel's plate sales people try to achieve the highest selling price possible under the particular market conditions prevailing at the time of sale. Francosteel's plate manager is guided by ongoing discussions with Dillinger regarding the price levels in the U.S. for sales of common plate qualities. Francosteel consults Dillinger for pricing on "project sales," *i.e.*, those presenting particular technical issues. Before Francosteel accepts a particular order from a customer, it holds discussions with Dillinger and obtains Dillinger's approval.

*Id.* Finally, in describing its back-to-back invoicing process for U.S. plate sales, Dillinger explained that "Francosteel must pay Dillinger according to certain terms of payment, which have no direct link with the receipt of payment by Francosteel from the U.S. customer." *Id.* at 16, Dillinger's App., Tab 2, at 29.

Francosteel's responsibilities change somewhat according to the complexity of the sale. In "uncomplicated sales," such as those involving repeat orders from an existing customer, Francosteel is guided by Dillinger's "periodic guidance as to what minimum price levels to seek in the U.S. market." *Id.* at 14, Dillinger's App., Tab 2, at 27; *see also Sales Verification Report* (June 13, 1996), at 4–5, Dillinger Reply Br., Tab 2, at 4–5. In this type of sale, Francosteel's sales people negotiate the highest price possible and then submit the order to Dillinger for approval. *U.S. Sales Verification Report,* at 4, P.R. 71, Dillinger's App., Tab 6, at 4.

In more complex sales or "project sales" involving a type of plate not commonly produced by Dillinger, Francosteel obtains the customer's specifications and sends them to Dillinger. *Dillinger's Revised Section A Response,* at 14, Dillinger's App., Tab 2, at 27. Dillinger will inform Francosteel, sometimes after several rounds of negotiations with the customer via Francosteel, of its approval of the specifications and price quotation. *Id.*

In response to Commerce's supplemental questionnaire on the specific issue of Francosteel's authority to negotiate sales independently of Dillinger, Dillinger asserted:

> [i]n all cases Dillinger sets the terms of sale, including price. In uncomplicated sales, as in complex sales, Dillinger always reserves the right to refuse an order entered through Francosteel's computer system. However, as a general rule, such a situation usually does not occur because the Product Manager at Francosteel, through daily telephone contact with Dillinger, is constantly aware of the terms which would be acceptable to Dillinger, and he therefore will make no offers inconsistent with these terms.

*Dillinger's Supplemental Section A Response* (Feb. 14, 1996), at 13, P.R. 49, Dillinger's App., Tab 4, at 18. With its Supplemental Response Dillinger provided a price list for the fourth quarter of 1994. *Id.*

Once an order is received from the customer, Francosteel conducts a credit check on the customer. *U.S. Sales Verification Report*, at 5, Dillinger's App., Tab 6, at 5. Once this credit analysis is complete, Francosteel enters the sales information into a computer system and transmits it electronically to Dillinger. *Id.* at 4, Dillinger's App., Tab 6, at 4. Upon review of the information, Dillinger confirms the sale with Francosteel. *Id.* Production does not begin until Dillinger's sales confirmation. *Id.* at 5, Dillinger's App., Tab 6, at 5. Dillinger produces and ships the merchandise and, once shipped, Dillinger sends Francosteel an invoice. *Id.* Francosteel in turn issues an invoice to the customer, usually when the merchandise arrives in the United States. *Id.*

Commerce verified the portions of Dillinger's questionnaire responses concerning Francosteel's role in the U.S. sales process for plate. The verification report summarized Francosteel's pre-production role in the U.S. sales process as:

> Customer sends an inquiry (orally or written) to Francosteel. Francosteel firms up details before forwarding to the mill for technical and sales responses. The mill returns with more technical questions or with a minimum price (if the technical aspects are clear). The minimum price sent by Dillinger is an effective price to the customer (Dillinger knows it will get slightly less than that because the price includes expenses paid by Francosteel— insurance, brokerage, wharfage, and duty). If Francosteel thinks it can get more than the minimum price guideline, it will. The minimum price is dictated to Francosteel by the mill, although Francosteel negotiates with the customer to get the best price possible.

*Id.* at 4, Dillinger's App., Tab 6, at 4.

In their administrative brief, Domestic Producers argued that contrary to Commerce's finding in the *Preliminary Results*, Dillinger's U.S. sale was a CEP transaction. Domestic Producers noted that Francosteel performed numerous substantial functions beyond processing sales-related documentation because it:

> purchases the subject merchandise from Dillinger and resells it ...; bears all risks of loss; acts as the importer of record for Dillinger plate sales; takes title to the subject merchandise, and retains title to the merchandise for a substantial period of time following exportation; holds itself out as the seller of the subject merchandise to its U.S. customers; finances the sale of subject merchandise to its U.S. customers; and provides numerous additional services and incurs additional expenses on behalf of its sales of the subject merchandise. Moreover, Francosteel creates and retains substantially more documentation regarding sales of the subject merchandise than would be the case if it were merely a document processor and communication link.

Dom. Prod. Case Brief, at 5–6.

In the *Final Results* Commerce classified the U.S. sale as a CEP transaction because Francosteel acted "as more than a processor of sales documents and a communications link between the unrelated U.S. customer and Dillinger." 62 Fed.Reg. at 18,391. Specifically, Commerce concluded that Francosteel "played a major role in negotiating and bringing about the sale, from the bidding stage through the final contract" and has "the flexibility to set the price of the steel" while Dillinger's sales role was "minimal." *Id.* at 18,391–92. Furthermore, Commerce listed Francosteel's specific sales activities for the period as follows: (1) Francosteel either solicited or responded to the initial U.S. customer contact; (2) Francosteel received U.S. customers' purchase orders; (3) Francosteel reviewed the U.S. customer's credit history (*i.e.*, ran a credit check on the U.S. customer); (4) using pricing and term guidelines provided by Dillinger, Francosteel negotiated the sale with the U.S. customer; (5) Francosteel took title to the merchandise; (6) Francosteel acted as importer of record; and (7) Francosteel invoiced the U.S. customer. *Id.* Dillinger does not dispute the fact that Francosteel performs these sales functions.

On appeal, Dillinger argues that its involvement in the sales negotiation process was direct. Dillinger argues that it respond-

ed to specific customer inquiries with a price quote or established initial price guidelines for merchandise regularly produced by Dillinger.[10] Dillinger provided daily guidance to Francosteel regarding prices and specifications of merchandise. Once an agreement was reached, Francosteel filled out an order sheet, checked the credit rating, and entered the information into the computer to share with Dillinger. Dillinger reviewed the order, and if in compliance, sent a confirmation to the customer. Thus, Dillinger argues that it, not Francosteel, set and could change the terms of sale up to the shipment date.

Commerce has devised a test which increasingly hinges on the subtle distinctions of the phrase "more than a processor of sales-related documentation and a communications link." This is not an easily administrable test and the court suggests that Commerce attempt to draw some sharper lines.

In the meantime the court must review application of the test used here. The court concludes that substantial evidence supports Commerce's decision that Francosteel played a more substantial role than in other cases where CEP classification was permitted. The record indicates that Francosteel actually negotiated for price above the Dillinger set minimum, whether or not Dillinger could in theory reject the price at a later time, that in the case of this "uncomplicated sale" communication was not on a continuous basis, and Francosteel has flexibility to make decisions on its own as to price. These factors, combined with all the normal selling functions, which have not always led to CEP classification, legitimately may be viewed as pushing this sale over the edge into the CEP rather than the EP category.

### 2. Commission Deduction from CEP

Section 1677a(d)(1)(A) of Title 19 instructs Commerce to reduce the price used to establish CEP by the amount of "commissions for selling the subject merchandise in the United States." The parties have noted the court's description of Commerce's pre-Uruguay Round practice with respect to commissions between related parties:

> Commerce generally does not make an adjustment for commissions paid to related parties. Commissions paid to related parties are considered intra-company transfers of funds, and, as such, do not qualify for a circumstances-of-sale adjustment. As intra-company transfers of funds, these payments are considered to be part of the general operating expenses of the company, and not costs directly related to particular sales.

*Outokumpu Copper Rolled Prods. v. United States,* 18 CIT 204, 209, 850 F.Supp. 16, 21 (1994) (citations omitted). As described in *Outokumpu Copper,* in general, with respect to a circumstances of sale adjustment, Commerce applied a two prong test to determine whether an adjustment for related party commissions are appropriate: (1) "the commissions must be directly related to the specific sales," and (2) "the commission arrangement must be the result of arm's length negotiations." *Id.* To determine the second prong of the test, Commerce:

> first compares the commissions paid to related and unrelated sales agents in the same market. If there are no commissions paid to unrelated parties, Commerce then compares the commissions earned by the related selling agent on sales of merchandise produced by the respondent, to commissions earned on sales of merchandise produced by other unrelated sellers or manufacturers. In appropriate circumstances, Commerce will also "examine the nature of the agreements or contracts between the manufacturer[s] and selling agent[s] which establish the framework for payment of commissions and for services rendered in return for payment."

*Id.* (quoting *Coated Groundwood Paper from the United Kingdom,* 56 Fed.Reg. 56,403, 56,406 (Dep't Commerce 1991)).

---

**10.** Domestic Producers argue that this factual assertion is unsupported by the record. Domestic Producers note that while the Home Market Verification Report states that Dillinger has daily contact with Francosteel, nothing explicitly indicates that these contacts relate to price negotiation. Rather, Domestic Producers argue that the evidence suggests that Dillinger's main involvement in the pricing of uncomplicated sales is to issue quarterly price guidelines. The evidence is not clear in this regard.

Based upon the affiliation of Francosteel and Daval, Dillinger argues that Commerce erred by deducting the commissions in its CEP calculation because it is Commerce's practice to assume that commission payments in related party transactions are not at arm's length, and not to require that respondents prove that such payments are intra-company transfers. Thus, Dillinger requests a remand to Commerce to "simply recalculate U.S. price without making a deduction for the related party commissions," with all other aspects of the calculation remaining the same. Dillinger Reply Br. at 11.

■ In response to Dillinger's argument, Domestic Producers argue that Dillinger is barred from raising this issue because it failed to exhaust its administrative remedies by not contesting Commerce's earlier decisions with respect to commissions in the context of the normal value calculation. In this situation, the fact that Dillinger did not contest the treatment of commissions for other purposes is insufficient to bar the argument. First, Commerce did not decide to deduct U.S. commissions from CEP until the *Final Results*, leaving Dillinger with only one forum in which to contest this determination, the court. It was the change to CEP and the deduction of U.S. commissions from CEP that created a dumping margin and thus prompted Dillinger to contest the determination.[11] This change, at least under the facts here, is sufficient to make commissions for CEP purposes a separate issue that could *not have been contested before the agency.*

In the alternative, Domestic Producers argue that the remand should not be granted because Commerce did not err in its determination. They argue that Dillinger's interpretation of Commerce's practice, that Commerce *assumes* that commission payments in related party transactions are not at arm's length, and not to require that respondents prove that such payments are intra-company transfers, is incorrect.[12] Rather, Dillinger, having sole control over the relevant information, has the burden of proving that the commissions were *not* at arm's length. Do-

mestic Producers argue that Dillinger has failed to meet this burden as it relied on statements about home market commissions, "self serving" claims, and inadequate responses to Commerce's questionnaire.

The court in *Outokumpu Copper,* 18 CIT at 210, 850 F.Supp. at 22, implicitly addressed the burden of proof issue regarding commissions paid to a related party in the U.S. for circumstances of sale adjustment purposes. In *Outokumpu Copper,* petitioners contested Commerce's remand determination that the respondent's commissions were indirect, rather than direct selling expenses. *Id.* at 208, 850 F.Supp. at 20. Specifically, petitioners asserted that Commerce improperly failed to place the burden of proof on respondents to demonstrate that the payments were not made at arm's length. *Id.* at 210, 850 F.Supp. at 22. The court held that:

> Commerce seeks to determine whether the payments between related parties were made at arm's length. Commerce does not seek to prove that such payments were not made at arm's length. Commerce has chosen to operate under the assumption that commission payments in related party transactions are not at arm's length. [Petitioners] essentially argue that Commerce should abandon this presumption when considering related party commissions in the U.S. market, and instead presume that the related party commissions were made at arm's length. Commerce, however, has rejected the argument that related party commissions should be considered under different standards depending upon the market in which the commission is paid.

*Id.* at 210–11, 850 F.Supp. at 22.

Domestic Producers argue that the holding in *Outokumpu Copper* cannot apply to situations where respondents are in sole control of the relevant information. Domestic Producers rely on *Creswell Trading Co., Inc. v. United States,* 15 F.3d 1054, 1060 (Fed.Cir. 1994), for the proposition that when informa-

---

**11.** The NV calculation is not challenged and may not be altered.

**12.** Commerce also disagrees with Dillinger's interpretation of its practice, but did not articulate what the correct interpretation is.

tion is solely in the control of one party, the burden of production is placed on that party.

While this statement generally may be true, the holding of *Creswell Trading* is of limited use here.[13] Further, Dillinger does not want a commission deduction for CEP purposes and did not point to an incentive to come forward with information on this point.[14] Moreover, Commerce also admitted at oral argument that its practice has not always been consistent with *Outokumpu Copper*. Treatment of commissions under the newly amended statute is not identical to that required by the statute applied in *Outokumpu Copper*. None of the parties explained well what burdens Commerce should now be imposing on respondents with regard to the facts involved in the various treatments of commissions under the statute.

The court finds it unnecessary to resolve these sub-issues at this stage of the proceedings. As indicated, there is an explicit statutory direction to deduct commissions from the sales price of CEP sales. *See* 19 U.S.C.A. § 1677a(d)(1)(A). The statute appears to require the expense represented by commissions to be deducted whether or not the producer/exporter and U.S. selling agent are affiliated. *Id.* Of course, if because of the relatedness of the producer and U.S. selling agent expenses represented by the commissions are already accounted for by means of a deduction for selling expenses nominally made under another provision of 19 U.S.C.A. § 1677a(d) or the expense does not truly exist, no additional commission deduction need be made.

▌ Here, Commerce requests a remand because it may have doublecounted certain U.S. expenses by deducting under "COMMISU" the commissions paid by Dillinger to Daval and by Daval to Francosteel,

as well as Francosteel's indirect selling expenses. The court finds that Commerce erred by not analyzing whether because of the relatedness of the parties double-counting occurred.[15] Thus, this issue is remanded to Commerce to follow the statute's instruction and make a deduction from CEP for expenses attributable to commissions. Based on the facts specific to this case, at this stage the only acceptable reasons to not make a separate "COMMISU" deduction are: (1) because the expense does not truly exist; or (2) because the expense represented by such a deduction is otherwise accounted for under 19 U.S.C.A. § 1677a(d).

### Conclusion

For the foregoing reasons, the court upholds Commerce's classification of Dillinger's U.S. sale as CEP and its treatment of antidumping and countervailing duties in calculating CEP. The court remands to Commerce to remultiply total actual profit by a ratio which does not include movement expenses in the total expenses denominator. The court also remands to Commerce to determine whether it over accounted for commissions in reductions to CEP and if so to correct its calculation. Remand results are due within sixty days. Objections are due twenty days thereafter, responses eleven days thereafter.

---

**13.** As was made clear in *U.S. Steel Group v. United States*, 18 CIT 1190, 1204–09, 873 F.Supp. 673, 689–92 (1994), *aff'd*, 96 F.3d 1352 (Fed.Cir.1996), the particular burden shifting at issue in *Creswell Trading* cannot resolve most CVD–AD inquiries.

**14.** Whether it would have on balance an incentive because of the NV calculation was not discussed.

**15.** Before the court, Commerce stated:

While we do not accept Dillinger's characterization of Commerce's practice, we nevertheless recognize that Commerce *may have erred* in calculating Dillinger's antidumping margin for the *Final Results*.

This court has repeatedly held that it will not grant a remand to the agency without a finding that the agency erred. *Wheatland Tube Co. v. United States*, 973 F.Supp. 149, 158 (1997). To remand without a finding of error negates the finality of the agency decision.