**Slip Op. 99-10**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

FLORAL TRADE COUNCIL,

      Plaintiff,

      v.

UNITED STATES,

      Defendant,

      and

ASOCIACION COLOMBIANA de
EXPORTADORES de FLORES, et al.,

      Defendant-Intervenors.

BEFORE: Pogue, Judge

Consol. Court No. 97-11-01988

[Sustained in part; remanded in part.]

Decided: January 27, 1999

Stewart and Stewart, (Terence P. Stewart, James R. Cannon, Jr., Amy S. Dwyer, William A. Fennell, and Mara M. Burr) for Plaintiff.

Frank W. Hunger, Assistant Attorney General of the United States; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; Lucius B. Lau, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice; Of Counsel, Mildred E. Steward, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for Defendant.

Arnold & Porter, (Michael T. Shor and Kevin T. Traskos) for Defendant-Intervenors.

**OPINION**

**Pogue, Judge:** This matter is before the Court on the separate

motions of Plaintiff, Floral Trade Council ("FTC"), and Defendant-

Intervenors, Asociacion Colombiana de Exportadores de Flores, et

al. ("Asocoflores"), for judgment on the agency record pursuant to U.S. CIT Rule 56.2.  The parties filed separate actions challenging various aspects of the Department of Commerce's ("Commerce") final results of the ninth administrative review[1] of the antidumping duty order on certain fresh cut flowers from Colombia.  See Certain Fresh Cut Flowers From Colombia, 62 Fed. Reg. 53,287 (Dep't Commerce, Oct. 14, 1997)(final determination)("Final Results"). The actions were consolidated.

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c)(1994) and 19 U.S.C. § 1516a(a)(2)(B)(iii)(1994).

The ninth administrative review covers a total of 351 Colombian producers and/or exporters of standard carnations, miniature (spray) carnations, standard chrysanthemums, and pompon chrysanthemums during the period March 1, 1995 through February 29, 1996 ("the period of review").  See Final Results at 53,288.  Given the large number of producers and/or exporters, Commerce narrowed its examination to the thirteen respondents accounting for the largest volume of subject flowers in accordance with § 777A(c)(2)(B) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677f-1(c)(2)(B)(1994).[2]  See Certain Fresh Cut Flowers From

---

[1]The antidumping statute provides for Commerce to conduct an administrative review of an antidumping duty order upon the request of an interested party.  See 19 U.S.C. § 1675.  As a result of the administrative proceeding, Commerce determines the actual antidumping duty rate for the entries covered by that period of review and establishes the duty deposit rate for future entries.  See id.

[2]Unless otherwise indicated, all citations to the antidumping statute are references to the provisions effective

<u>Colombia</u>, 62 Fed. Reg. 16,772 (Dep't Commerce, Apr. 8, 1997)(preliminary results).

FTC challenges: (1) Commerce's decision not to deduct commissions paid to affiliated consignment agents from constructed export price and (2) Commerce's decision not to collect third-country sales prices from the respondents in the review ("respondents") to determine whether third-country prices could be used as a basis for normal value.[3] <u>See</u> Pl.'s Mot. for J. on the Agency R. at 2.

_____

January 1, 1995, the effective date of the amendments to the statute by the Uruguay Round Agreements Act ("URAA"). In addition, unless otherwise indicated, all citations to Commerce's regulations are to those codified at 19 C.F.R. § 353 (April 1997).

[3]This Court sustained Commerce's decision to resort to constructive value rather than use third-country prices in the appeal of the final results for the consolidated fifth, sixth, and seventh administrative reviews. <u>See</u> <u>Asociacion Colombiana de Exportadores de Flores, et al. v. United States</u>, 22 CIT ___, ___, 6 F. Supp.2d 865, 901-03 (1998). In its brief, FTC offers no legal or factual arguments to advance its position that Commerce should have used third-country sales prices as the basis for normal value. <u>See</u> Pl.'s Mem. of P. & A. in Supp. of Rule 56.2 Mot. for J. on the Agency R. at 10. Instead, FTC merely states that it raises the issue again in the present action to preserve it pending the appeal of this Court's decision in <u>Asociacion</u>. <u>See id.</u>
      Although this Court's decision in <u>Asociacion</u> applied the pre-URAA version of the antidumping statute, the current law codifies Commerce's prior practice. <u>See</u> 19 U.S.C. § 1677b(a)(1)(B)(ii)(III)(1994)(requiring Commerce to reject third-country prices as a basis for normal value when "the particular market situation in such other country prevents a proper comparison with the export price or constructed export price."). Moreover, the factual basis supporting Commerce's decision to reject third-country sales has not changed since the prior reviews. <u>See</u> Recommendation Memorandum Regarding Calculation of Normal Value (Pub. Doc. 309)(Nov. 21, 1996) at 7-8. Therefore, the Court sustains Commerce's decision to reject third-country sales as the basis for normal value.

Asocolfores challenges: (1) Commerce's rejection of the constructed value "profit cap" in calculating constructed value, see Initial Br. of Def.-Intervenors in Supp. of Rule 56.2 Mot. for J. on the Agency R. ("Asocolfores Br.") at 2; (2) Commerce's determination to deduct credit expenses from U.S. price but not from constructed value, see id. at 3; (3) Commerce's determination to exclude antidumping surcharges from constructed export price, see id. at 4; (4) Commerce's decision not to include the net monetary correction in calculating constructed value, see id. at 5; (5) Commerce's issuance of erroneous questionnaire instructions and subsequent penalization of respondents for complying with such instructions,[4] see id. at 6; (6) Commerce's calculation and

---

[4]For purposes of the ninth administrative review, Commerce's questionnaire instructed respondents not to offset expenses with interest income or other revenue in calculating indirect selling expenses (a component of the constructed export price). Because, as Asocolfores correctly notes, the antidumping statute and regulations require compliance with Commerce's instructions, the respondents accordingly did not offset indirect selling expenses with interest income in completing the questionnaire. See Asocolflores Br. at 41-42 (citing 19 C.F.R. § 353.37 and 19 U.S.C. § 1677e).

One respondent, however, Queen's Flowers Group, noted in its response that it believed Commerce's instruction to treat interest expenses as indirect selling expenses while ignoring interest income was unfair. See id. at 41 (citing Queen's July 19, 1996 Submission (Pub. Doc. 240) at 56-57). In its final determination, Commerce "acknowledge[d] that the questionnaire did not clearly reflect the Department's practice of allowing interest income offsets in limited circumstances[,]" but only allowed Queen's Flowers Group to make the adjustment, since Queen's raised the issue in a "timely manner[.]" Final Results at 53,294.

Asocolflores argues that Commerce's determination is inconsistent with the procedural regulations and deprives respondents of procedural due process by penalizing them for complying with Commerce's own express instructions. See Asocolflores Br. at 42.

application of the constructed export price profit ratio, see id.
at 7; (7) Commerce's decision to impute a consolidated general and
administrative expense rate for all farms of the HOSA Group in
calculating the cost of production, see id. at 8; and (8)
Commerce's determination not to allocate any production costs to
second quality subject flowers.[5]  See id.

## Standard of Review

The Court will uphold a Commerce determination in an
administrative review unless it is "unsupported by substantial
evidence on the record, or otherwise not in accordance with law[.]"
19 U.S.C. § 1516a(b)(1)(B)(i)(1994).

The issues presented here primarily require the Court to
determine whether Commerce's interpretations of the antidumping

---

Commerce concedes that this issue should be remanded.  See
Def.'s Mem. in Partial Opp'n to Def.-Intervenors' Mot. for J. on
the Agency R. at 47.  Because the antidumping statute and
regulations require compliance with Commerce's instructions, and
because the instructions issued in this review were inconsistent
with Commerce's practice, the Court remands the issue directing
Commerce to: (1) reconsider this issue; (2) allow respondents to
submit information concerning the interest income offset to
indirect selling expenses in calculating constructed export
price; and (3) make adjustments, as appropriate, based upon this
information.

[5]This Court sustained Commerce's decision not to allocate
any costs of production to "national quality" flowers sold in the
home market for the fifth, sixth, and seventh administrative
reviews.  See Asociacion, 22 CIT at ___, 6 F. Supp.2d at 880-83.
In its brief, Asocolflores states, "[s]ince we are not making any
new arguments or presenting any new factual evidence to the
Court, we simply identify the issue here to preserve it for any
future appeal."  Asocolflores Br. at 54.  The Court sustains
Commerce's treatment of national quality flowers in the ninth
review.

statute are permissible. In determining whether Commerce's interpretation and application of the antidumping statute is in accordance with law, the Court applies the two-step analysis articulated in <u>Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 842-43 (1984), as applied and refined by the Court of Appeals for the Federal Circuit ("Federal Circuit").

The first step is to investigate a matter of law--"whether Congress's purpose and intent on the question at issue is judicially ascertainable." <u>Timex V.I., Inc. v. United States</u>, 157 F.3d 879, 881 (Fed. Cir. 1998)(citing <u>Chevron</u>, 467 U.S. at 842-43 & n.9). "To ascertain whether Congress had an intention on the precise question at issue, [the Court] employ[s] the 'traditional tools of statutory construction.'" <u>Id.</u> at 882 (citing <u>Chevron</u>, 467 U.S. at 843 n.9). If the statute's plain language answers the question, "that is the end of the matter." <u>Id.</u> (citing <u>Muwwakkil v. Office of Personnel Management</u>, 18 F.3d 921, 924 (Fed. Cir. 1994)). Beyond the statute's text, the tools of statutory construction include the statute's legislative history, the statute's structure, and the canons of statutory construction.[6] <u>See id.</u>

If, after employing the first prong of <u>Chevron</u>, the Court

---

[6]Not all rules of statutory construction rise to the level of a canon, however. <u>See</u> <u>U.S. Steel Group v. United States</u>, 22 CIT ____, ___, 998 F. Supp. 1151, 1157-58 (1998)(rejecting the use of the maxim *expressio unius est exclusio alterius* to discern Congress's intent under <u>Chevron</u> step one).

determines that the statute is silent or ambiguous with respect to the specific issue, the Court proceeds to the second step.  See Chevron, 467 U.S. at 843.  The second step concerns an issue of policy.  Because Congress intended to delegate policymaking to Commerce, the Court must defer to Commerce's reasonable interpretation.  See Koyo Seiko Co., Ltd. v. United States, 36 F.3d 1565, 1573 (Fed. Cir. 1994).  "In determining whether Commerce's interpretation is reasonable, the Court considers, among other factors, the express terms of the provisions at issue, the objectives of those provisions[,] and the objectives of the antidumping scheme as a whole."  Mitsubishi Heavy Industries, Ltd. v. United States, 22 CIT ___, ___, 15 F. Supp.2d 807, 813 (1998).

**Discussion**

Commerce calculates an antidumping duty by comparing an imported product's price in the United States to its normal value ("NV")(i.e., the price of comparable merchandise in the exporting country).  The dumping margin is the amount by which the normal value exceeds the United States price.  See 19 U.S.C. § 1673 (1994).

The United States price is calculated as either the "export price" ("EP") or the "constructed export price" ("CEP").  See 19 U.S.C. § 1677a.  Typically, Commerce uses EP when the foreign exporter sells directly to an unrelated U.S. purchaser.  See 19 U.S.C. § 1677a(a).  Commerce uses CEP when the foreign exporter sells through a related party in the United States.  See 19

U.S.C. § 1677a(b).

NV is the price of the merchandise in the producer's home market or its export price to countries other than the United States. See 19 U.S.C. § 1677b(a)(1). Where Commerce cannot compute the home market price, Commerce may base NV on a constructed value ("CV"), see 19 U.S.C. § 1677b(a)(4), which is calculated pursuant to § 1677b(e).

## I. Commerce's Decision Not to Deduct Commissions Paid to Affiliated Consignment Agents from CEP[7]

In a consignment arrangement, the exporter (the consignor) delivers merchandise to an agent in the United States (the consignee) under agreement that the agent will sell the merchandise for the account of the exporter. See EDWARD G. HINKELMAN, DICTIONARY OF INTERNATIONAL TRADE 44 (1994). The consignor retains title to the goods sold, and the consignee sells the goods for commission, remitting the net proceeds to the consignor. See id.; see also BLACK'S LAW DICTIONARY 307 (6th ed.). Here, certain Colombian exporters were engaged in consignment arrangements during the period of review, paying commissions to both affiliated and unaffiliated consignees. See Def.'s Mem. in Opp'n to Pl.'s Mot. for J. on the

---

[7]This Court previously sustained Commerce's decision not to deduct commissions paid to related consignees in the fifth, sixth, and seventh administrative reviews of Certain Fresh Cut Flowers from Colombia. See Asociacion, 22 CIT at ___, 6 F. Supp.2d at 898-901. Because the wording of the applicable statutory provision has since been amended by the URAA, and the parties make different arguments, the Court revisits the issue here.

Agency R. ("Def.'s Mem. in Opp'n to Pl.") at 11.

The statute provides for the deduction of certain expenses

from CEP, including commissions:

> [T]he price used to establish constructed export price
> shall also be reduced by--
>
> (1) the amount of any of the following expenses generally
> incurred by or for the account of the producer or
> exporter, or the affiliated seller in the United States,
> in selling the subject merchandise (or subject
> merchandise to which value has been added)--
>
> (A) commissions for selling the subject merchandise in
> the United States;
> (B) expenses that result from, and bear a direct
> relationship to, the sale, such as credit expenses,
> guarantees and warranties;
> (C) any selling expenses that the seller pays on behalf
> of the purchaser; and
> (D) any selling expenses not deducted under subparagraph
> (A), (B), or (C)[.]

19 U.S.C. § 1677a(d)(1)(1994).

For the unaffiliated consignees, Commerce deducted the

commissions paid by the exporters from the CEP. See Def.'s Mem. in

Opp'n to Pl. at 11. For the affiliated consignees, however,

Commerce explained that it did not deduct commissions paid by

exporters from the CEP because to do so would have led to "double-

counting." See Final Results at 53,294. Commerce argues that the

commissions paid to affiliated consignees reimburse them for

expenses that Commerce already deducts as indirect selling expenses

under § 1677a(d)(1)(D). See Def.'s Mem. in Opp'n to Pl. at 14.

Therefore, deducting both the commissions paid to affiliated

consignees and indirect selling expenses would double-count the

expenses. See id. In contrast, double-counting does not arise

from the deduction of commissions for the unaffiliated consignees because the statute does not require the deduction of the unaffiliated consignees' U.S. selling expenses from CEP. See 19 U.S.C. § 1677a(d)(1).

FTC points out that the plain language of the amended provision does not distinguish between commissions paid to affiliated and unaffiliated parties. See Pl.'s Mem. of P. & A. in Supp. of Rule 56.2 Mot. for J. on the Agency R. ("FTC Br.") at 8. Although the statute does appear to require the expense represented by commissions to be deducted from CEP whether or not the producer/exporter and U.S. consignee are related, the statute does not define "commission." Where, as here, Congress's intended definition of "commission" is not ascertainable through the traditional tools of statutory construction, the Court will defer to Commerce's reasonable interpretation. See Koyo Seiko, 36 F.3d at 1573.

This Court has sustained Commerce's practice of treating commissions paid by the producer/exporter to a related consignee as an intracompany transfer, rather than as a true commission because they merely serve as reimbursements to related parties. See Asociacion, 22 CIT at ___, 6 F. Supp.2d at 900.[8] Commerce's decision not to deduct commissions paid to affiliated consignees is therefore reasonable to the extent that it fulfills the statutory

_____

[8]Although the Court's decision in Asociacion involved pre-URAA law, the amended statute continues not to define "commission." Therefore, the Court's analysis in that decision is still applicable here.

objective of preventing double-counting.  See U.S. Steel Group v. United States, 22 CIT _____, _____, 15 F. Supp.2d 892, 905 (1998)(holding that, "if because of the relatedness of the producer and U.S. selling agent expenses represented by the commissions are already accounted for by means of a deduction for selling expenses nominally made under another provision of 19 U.S.C.A. § 1677a(d) . . . , no additional commission deduction need be made.").

FTC, however, does not dispute that the prevention of double-counting is a reasonable application of the statute.  See Pl.'s Reply to Def.-Intervenors' Rebuttal Br. at 1-2.  FTC explains that double-counting of the deduction will not occur because the statute "instructs [Commerce] to calculate constructed export price first by deducting commissions and direct selling expenses and then [by] any selling expenses not already deducted."  FTC Br. at 8 (citing 19 U.S.C. § 1677a(d))(emphasis provided).  "To the extent that the record demonstrates that the commissions include reimbursement for expenses incurred by the consignee, such expenses, already adjusted for under subparagraph A, would not be adjusted for under subparagraph D."  Pl.'s Reply to Def.-Intervenors' Rebuttal at 2.

Instead, FTC argues that Commerce's application of the statute violates its plain language because Commerce did not apply the deductions of 19 U.S.C. § 1677a(d)(1) in proper sequence.  See id. at 2.  FTC contends that the statute sets up a hierarchy of deductions to be followed sequentially.  See FTC Br. at 8. According to FTC, "[Commerce] cannot properly implement the statutory language unless it performs its adjustments in sequence."

Pl.'s Reply to Def.-Intervenors' Rebuttal Br. at 2.

Neither the statute nor its legislative history, however, explicitly requires that the deductions should be made in literal sequence. Subparagraph (D) requires Commerce to reduce CEP by "any selling expenses not deducted under subparagraph (A), (B), or (C)[.]" 19 U.S.C. § 1677a(d)(1)(D). So long as expenses are not double-counted under subparagraph (D), Commerce may apply the deductions in any order reasonable under the circumstances. Here, Commerce's application of the statute would seemingly result in the exact same calculation for total adjustments to CEP advocated by FTC. Because Commerce's application of the statute neither violates Congress's express intent nor is unreasonable, it is in accordance with law.

Nevertheless, Commerce's determination must also be supported by substantial evidence. FTC argues that the record does not demonstrate that commissions paid to affiliated consignees were reimbursements (i.e., intracompany transfers) for their U.S. selling expenses, and therefore, "[Commerce's] failure to deduct such commissions is unsupported by substantial evidence[.]" Pl.'s Reply to Def.-Intervenors' Rebuttal Br. at 2-3. The record, however, indicates that commissions paid to related consignees were intracompany transfers by definition, since Commerce's questionnaire instructs that "commissions paid to affiliates need not be reported." See Dep't of Commerce Questionnaire (Public Doc. 42)(May 16, 1996) at C-16.

FTC further appears to be concerned that, to the extent that

commissions paid to affiliated consignees exceed the consignees' indirect selling expenses, Commerce fails to deduct the difference as a commission expense to producers/exporters. FTC's concern is resolved, however, by § 1677a(d)(3), a new provision under the URAA that requires CEP to also be reduced by "the profit allocated to the expenses described in paragraphs (1) and (2),"[9] which include indirect selling expenses. 19 U.S.C. § 1677a(d)(3). While commissions represent expenses to the paying producers, the amount by which the commissions exceed the selling expenses incurred by consignees constitute profit for these consignees. By reducing CEP by the profit allocated to the indirect selling expenses incurred by affiliated consignees, the provision assures that CEP will not be inflated to the extent that the commissions paid to affiliated consignees exceed their expenses. In this regard, Congress instructed Commerce to calculate a "statutory profit" as opposed to an "accounting profit." At oral argument on January 12, 1999, Commerce demonstrated that this adjustment was made for commissions paid to related consignees that exceeded the consignees' actual expenses. See Commerce Calculation Printout (Prop. Doc. 285)(Oct. 6, 1997) at line 661.

Therefore, the Court sustains Commerce's decision not to deduct commissions paid to related consignees from CEP.

_____

[9]The expenses in paragraph (1) refer to commissions, direct selling expenses, selling expenses paid by the seller on behalf of the purchaser, and indirect selling expenses. See 19 U.S.C. § 1677a(d)(1). Paragraph (2) refers to "the cost of any further manufacture or assembly" in the United States. 19 U.S.C. § 1677a(d)(2).

## II.  Commerce's Rejection of the Constructed Value "Profit Cap"

### A.  Background

Profit is a component in the calculation of CV.  See 19 U.S.C. § 1677b(e)(2)(1994).  Under the current statute, as amended by the URAA, the preferred method for measuring profit is to add to CV "the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review . . . for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country[.]"  19 U.S.C. § 1677b(e)(2)(A).

If data are not available with respect to § 1677e(2)(A), then Commerce may select one of the following three alternative methods for calculating profit:

> (i) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review . . . for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise,
>
> (ii) the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) . . . for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or
>
> (iii) the amounts incurred and realized . . . for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise[.]

19 U.S.C. § 1677b(e)(2)(B)(emphasis provided); see also Statement of Administrative Action, H.R. Doc. No. 103-316, 103rd Cong., 2nd Sess. (1994), reprinted in URUGUAY ROUND AGREEMENTS ACT, LEGISLATIVE HISTORY, Vol. VI, at 840 ("SAA")(stating that "new section [1677b(e)(2)(B)] does not establish a hierarchy or preference among these alternative methods").[10]  The underlined portion of alternative (iii) is known as the "profit cap."  See SAA at 840.

Commerce rejected alternative (ii) because there was no data concerning foreign like product sold in the "ordinary course of trade" as required by the provision.  See Def.'s Mem. in Partial Opp'n to Def.-Intervenors' Mot. for J. on the Agency R. at 26-27; see also 19 U.S.C. § 1677b(e)(2)(B)(ii).  The "ordinary course of trade" test requires, among other conditions, that the sales are profitable (i.e., not made at below-cost prices).  See 19 U.S.C. § 1677(15)(A)(1994); see also SAA at 840.  Unlike the preferred methodology and alternative (ii), however, alternatives (i) and (iii) do not require the amount for profit to be calculated based on home country sales of a foreign like product in the ordinary course of trade.  See 19 U.S.C. §§ 1677b(e)(2)(B)(i) & (iii).  Instead, alternatives (i) and (iii) simply require that the calculation for profit be based on home country sales of

_____

[10]The Statement of Administrative Action represents "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements . . . ."  SAA at 656.  "[I]t is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in this Statement."  Id. (quoted in Delverde, SrL v. United States, 21 CIT ___, ___, 989 F. Supp. 218, 229-30 n.18 (1997)).

"merchandise in the same general category of products as the subject merchandise." Id.

In calculating profit for CV, Commerce selected alternative (iii) and applied it on the basis of "the facts available." See Final Results at 53,302 (citing SAA at 841). Commerce explained that it interprets CV as requiring a positive amount for profit. See id. at 53,301-302. Because home market sales of the same general category of merchandise as flowers were made at below-cost prices, Commerce reasoned it could not calculate a positive profit cap. See id. Where a positive profit cap cannot be measured, Commerce interpreted the SAA as allowing it to disregard alternative (i) and the alternative (iii) profit cap and apply alternative (iii) on the basis of "the facts available." See id. at 53,302 (citing SAA at 841). As "the facts available," Commerce assigned a profit rate of five percent (of the sum of general expenses and cost), which it obtained from Compania Nacional de Chocolates S.A., a Colombian producer of chocolate, coffee, and dairy products. See id. at 53,301.

Asocolflores argues that Commerce's ruling that the profit cap contained in alternative (iii) does not apply is contrary to the statute's intent, and thus, must be reversed under the first prong of Chevron. See Asocolflores Br. at 17. According to Asocolflores, the profit cap is mandatory, requiring "that the amount allowed for profit may not exceed the amount normally realized by exporters or producers . . . in connection with the sale, for consumption in the foreign country, of merchandise that

is in the same general category of products as the subject merchandise[.]"  See id.  at  20  (citing  19  U.S.C.  § 1677b(e)(2)(B)(iii)).

Asocolflores demonstrates that numerous respondents made sales in Colombia of "merchandise that is in the same general category of product as the subject merchandise,"[11] and neither Commerce nor FTC dispute this claim.  Moreover, all such producers indicated in their questionnaires that the home market sales of other export quality flowers were made below-cost. See Asocolfores Br. at 18-19 (and citations at n. 18).  Therefore, Asocolflores contends, the profit amount normally realized by producers for sales in Colombia of merchandise in the same general category of products as the subject merchandise is zero.  See id. at 20.

**B. Analysis**

This Court must determine whether Commerce's decision to reject the profit cap during the period of review is in accordance

---

[11]The flowers subject to the current review are carnations, miniature carnations, pompons, and mums.  Asocolflores demonstrates that numerous Colombian producers made sales in Colombia of export quality flowers other than those subject to the antidumping order, including roses, alstroemeria, gypsophia, gerbera, and statice, among others. See Asocolflores Br. at 18-19 (citing, e.g., Inverpalmas July 11, 1996 Response (Conf. Doc. 60) at 55; Manjui July 11, 1996 Response (Conf. Doc. 68) at 50-51; Flores de Suba July 12, 1996 Response (Conf. Doc. 99) at D-55 to D-56; Flores de la Sabana July 12, 1996 Response (Conf. Doc. 87) Sec. D at 39; Agricola Bonanza July 11, 1996 Response (Conf. Doc. 41) at 51-52; Industrial Agricola Aug. 15, 1996 Response (Conf. Doc. 149) Sec. D, Field 10.0.  Because alstroemeria, gypsophila, and gerbera were within the scope of the original antidumping order, see Certain Fresh Cut Flowers From Colombia, 52 Fed. Reg. 6,842, 6,843 (Dep't Commerce Mar. 5, 1987)(final determination), they are in the "same general category of products as the subject merchandise" in the ninth review.

with law.  The plain language of alternative (iii) indicates that the profit cap is a mandatory requirement of that provision. Again, that section states that Commerce will add to CV "the amounts . . . realized . . . for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by . . . producers" in connection with home market sales of "merchandise that is in the same general category of products as the subject merchandise."  19 U.S.C. § 1677b(e)(2)(B)(iii).  Commerce, however, justified its rejection of the profit cap by reference to language in the SAA, which states,

> The Administration also recognizes that where, due to the absence of data, Commerce cannot determine amounts for profit under alternatives (1) and (2) or a "profit cap" under alternative (3), it might have to apply alternative (3) on the basis of "the facts available."  This ensures that Commerce can use alternative (3) when it cannot calculate the profit normally realized by other companies on sales of the same general category of products.

SAA at 841.

The question of whether Commerce properly rejected the profit cap hinges on Commerce's determination that the statute is ambiguous as to whether it requires a positive amount for profit. If the language of § 1677b(e)(2)(B)(iii)--in light of its legislative history, structure, and the canons of construction--is ambiguous, Commerce may reasonably interpret it as requiring a positive profit amount for CV.  Commerce could then permissibly reject the profit cap and resort to the facts available because it could not calculate a positive amount for profit.  If, however,

Congress intended that alternative (iii) would not require a positive amount for profit, then Commerce's rejection of the profit cap is impermissible.

The SAA explicitly states that Commerce may resort to "the facts available" under alternative (iii) "due to the absence of data." Id. If Congress intended that the actual amount of profit be zero where all sales are made below cost, then this is not a situation where data is absent because Asocolflores has pointed to undisputed record evidence indicating that numerous Colombian producers made home market, below-cost sales of flowers in the same general category as the subject flowers. Commerce would then apply the profit cap as demonstrated by Asocolflores, using a profit rate of zero for the below cost sales of export quality flowers.

Therefore, the precise question before the Court is whether Commerce's determination that alternative (iii) of 19 U.S.C. § 1677b(e)(2)(B) may require a positive amount for profit is in accordance with law. In reviewing Commerce's interpretation, the Court employs the two-step analysis of Chevron.

Under the first prong of Chevron, the Court asks whether Congress's purpose and intent on the question at issue is judicially ascertainable. See Timex, 157 F.3d at 881. Commerce based its interpretation of a positive profit amount requirement on language from the SAA. Commerce explained,

> Although the URAA eliminated the use of a minimum profit
> rate, the presumption of a profit element in the
> calculation of CV was not eliminated. The SAA [at page
> 839] states: "Because constructed value serves as a proxy
> for a sales price, and because a fair sales price would

> recover SG&A expenses and would include an element of profit, constructed value must include an amount for SG&A expenses and for profit."

Final Results at 53,301 (citing SAA at 839).  Although the above statement could possibly be interpreted in isolation as requiring a positive amount for profit, the Court is not persuaded by Commerce's reliance on it alone in light of the statute's language, legislative history, and structure.  See United States v. Taylor, 487 U.S. 326, 344-46 (1988)(concurring opinion of Justice Scalia)(stating that reliance upon an isolated excerpt from a statute's legislative history is indeterminate and result-oriented).  The Court affords the plain language of the statute the most weight.  See Timex, 157 F.3d at 882.  If the provision's text does not resolve the issue, the Court conducts a more thorough examination of the statute's legislative history and structure, employing the canons of statutory construction, to determine whether Congress's intent is otherwise clearly discernible.  See id.

### 1.  The Statute's Language

Although the text of § 1677b(e)(2)(B)(iii) is not explicit as to whether it requires a positive amount for profit in CV, its language impliedly contradicts such a conclusion.  Unlike both the preferred methodology and alternative (ii), alternative (iii) does not require that the sales from which profit is calculated be in "the ordinary course of trade."  See 19 U.S.C. § 1677b(e)(2)(B)(iii).  The "ordinary course of trade" test requires that the sales are profitable (i.e., not made at below cost

prices).[12]  See 19 U.S.C. § 1677(15)(A).  "It is well established that where Congress has included specific language in one section of a statute but has omitted it from another, related section of the same Act, it is generally presumed that Congress intended the omission."  Ad Hoc Committee of AZ-NM-TX-FL Producers of Gray Portland Cement v. United States, 13 F.3d 398, 401 (Fed. Cir. 1994).  That Congress specifically required the sales for the preferred methodology and alternative (ii) to be profitable, but did not require alternative (iii) sales to be profitable, undermines Commerce's conclusion that the amount allowed for profit in alternative (iii) must be positive.

Statements in the SAA add support to the conclusion that Congress did not intend to require alternative (iii) sales to be profitable.  After discussing alternative (iii), the SAA states that, "the Administration does not intend that Commerce would engage in an analysis of whether sales in the same general category are above-cost or otherwise in the ordinary course of trade."  SAA

---

[12]Although the ordinary course of trade test requires more than that the sales be profitable, Congress clearly was cognizant of this condition when amending the CV profit calculation because Congress amended the definition of "ordinary course of trade" under the URAA to specifically exclude below cost sales.  See 19 U.S.C. § 1677(15)(1994)(referencing 19 U.S.C. § 1677b(b)(1) (1994)); see also SAA at 834 ("Section 222(h) of the bill amends section [1677(15)] to specify additional types of transactions that Commerce may consider to be outside the ordinary course of trade, including: (1) sales disregarded as being below-cost[.]").  Moreover, in discussing alternative (ii) of the CV profit calculation, the SAA states, "although it relies on the sales experience of other companies, this alternative requires the use of sales in the ordinary course of trade, i.e., profitable sales."  SAA at 840.

at 841.  Alternative (iii) bases its calculation on "sales in the same general category;" thus, Congress intentionally permitted sales serving as alternative (iii)'s basis for calculation to be below cost.  Moreover, the SAA discussion of § 1677b(e)(2) indicates that Congress was aware that where sales are below cost, profit is zero.  See SAA at 839 ("Moreover, Commerce has used an average profit rate, which includes below-cost sales for which the profit is zero.")(emphasis provided).  That Congress did not require alternative (iii) sales to be profitable undermines Commerce's conclusion that the amount allowed for profit in alternative (iii) must be positive.

## 2. Legislative History

A further look into the legislative history adds support to Asocolflores' position.  The URAA amendments significantly changed the statute's calculation of CV.  The previous provision included a minimum profit amount of eight percent of the sum of the general expenses and cost.  See 19 U.S.C. § 1677b(e)(1)(B)(ii)(1988).  The URAA amendments eliminated the minimum profit amount, introducing the preferred methodology and the three alternatives as the bases for profit calculation.  The House Report to the URAA states that the CV calculation was "amended to reflect more specifically the obligations of the Agreement[,]" referring to the Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994 (Antidumping)("Agreement").  H. Rep. No. 103-826(I), 103rd Cong., 2nd Sess. at 95 (1994).  Indeed, the language of the amended provision, § 1677b(e)(2) closely mirrors the language of

Article 2.2.2 of the Agreement.[13]

During the negotiations that provided the foundation for the Agreement's CV calculation, "[t]he focus of the debate was whether statutory minimums for profit and general selling and administrative expenses, such as those employed by the United States, were consistent with the Agreement or whether perhaps actual data for expenses and profit should be explicitly required by the Code provisions." THE GATT URUGUAY ROUND: A NEGOTIATING HISTORY Vol. II at 1554 (Terence P. Stewart ed., 1993). Korea, Hong Kong, Singapore, Japan, and the Nordic countries, among others, "expressed the position that the general expenses and profit used for purposes of calculating the constructed value should be

---

[13]Article 2.2.2 of the Agreement provides,

[T]he amounts for administrative, selling and general costs and for profits shall be based on actual data pertaining to production and sales in the ordinary course of trade of the like product by the exporter or producer under investigation. When such amounts cannot be determined on this basis, the amounts may be determined on the basis of:

(i) the actual amounts incurred and realized by the exporter or producer in question in respect of production and sales in the domestic market of the country of origin of the same general category of products;

(ii) the weighted average of the actual amounts incurred and realized by other exporters or producers subject to investigation in respect of production and sales of the like product in the domestic market of the country of origin;

(iii) any other reasonable method, provided that the amount for profit so established shall not exceed the profit normally realized by other exporters or producers on sales of products of the same general category in the domestic market of the country of origin.

determined on the basis of the company's <u>actual</u> data in all cases where it is possible." <u>Id.</u> at 1557-58.

The final version of the Agreement did not include a minimum profit figure, and therefore, to specifically reflect the obligations of the Agreement, Congress eliminated the minimum profit requirement from its own statute. <u>See</u> 19 U.S.C. § 1677b(e)(2). Commerce maintains that alternative (iii) requires a positive profit amount in CV--even where actual data indicate below cost sales in the home market of merchandise that is in the same general category of products as the subject merchandise. To require a positive amount for profit, in essence, would still enforce a minimum. Commerce's interpretation, therefore, violates the spirit of Congress's intention to eliminate a profit minimum for CV in favor of actual data to conform with the Agreement.

**3.  The Statute's Structure**

Finally, the Court examines the statute's structure. Again, alternative (iii) requires that Commerce add to CV "the <u>amounts</u> incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the <u>amount</u> allowed for profit may not exceed the <u>amount</u> normally realized[.]" 19 U.S.C. § 1677b(e)(2)(B)(iii)(emphasis provided).

The antidumping statute contains numerous provisions requiring Commerce to adjust for the "amount" of various expenses. <u>See, e.g.</u>, 19 U.S.C. §§ 1677a(c) & (d), 1677b(a)(6) & (7)(B). When the "amount" of such expenses is zero or negative, Commerce makes a

zero or negative adjustment.[14]  The Court presumes that the same words used twice in the same act have the same meaning.  See ICC Industries, Inc. v. United States, 812 F.2d 694, 700 (Fed. Cir. 1987).  Therefore, the requirement of a positive amount for profit in § 1677b(e)(2)(B)(iii) is presumptively negated where the record indicates that profitable sales do not exist.

Moreover, Commerce's treatment of profit is inconsistent with respect to the calculations of CV and CEP.  To calculate the amount of profit to be deducted from CEP pursuant to § 1677a(d)(3), Commerce must calculate "total actual profit."  See 19 U.S.C. § 1677a(f)(2)(D).  For the current review, Commerce interpreted "total actual profit" to include profits on home market sales and U.S. market sales.  See Memorandum: Calculation Methodology for CEP Profit in the Ninth Antidumping Administrative Review of Certain Fresh Cut Flowers from Colombia (Pub. Doc. 438)(Mar. 20, 1997) at 1.  In addition, Commerce addressed whether non-profitable home market sales would be used as the basis for home market profit in calculating "total actual profit" pursuant to § 1677a(f)(2)(D).  See id. at 2.  Commerce concluded that "there is no provision in the statute for disregarding sales below cost in this context, and doing so would conflict with the statutory requirement to use

---

[14]For example, the "amount" of credit expenses can be negative when the customer prepays.  Commerce then reduces the U.S. price by a negative amount, thereby increasing the price. See 19 U.S.C. § 1677a(d)(1)(B); see also Silicon Metal from Brazil, 62 Fed. Reg. 1970, 1977-78 (Jan. 14, 1997); Industrial Nitrocellulose from Brazil, 55 Fed. Reg. 23,120, 23,122 (June 6, 1990)(stating that, where the customer prepays, the "credit expense result[s] in a negative amount").

'actual profit.'" Id.  Thus, for purposes of calculating "total actual profit," Commerce recognizes that the actual profit of below cost sales in the home market is zero.

Commerce's incongruous treatment of home market profit for CV and CEP is inconsistent with Congress's intent.  As noted, there is a presumption that the same words used twice in the same act have the same meaning.  ICC Industries, 812 F.2d at ___.  To interpret the actual profit incurred for below cost sales in the home market for purposes of CEP to be zero, while denying that the profit "amount normally realized" can be zero for purposes of the CV profit cap in alternative (iii), violates the presumption that home market profit will have the same meaning for both sections.

Moreover, § 1677b(a) states that, "[in] determining under this title whether subject merchandise is being, or is likely to be, sold at less than fair value, a fair comparison shall be made between the export price or constructed export price and normal value."  19 U.S.C. § 1677b(a).  It seems hardly fair for Commerce to interpret actual profits of below cost sales in the home market to be zero for purposes of CEP while denying that the same actual profit may be zero for purposes of CV.  Such an interpretation appears inconsistent with Congress's specific intent to make a fair comparison between the home market price and the export price.

**C.  Conclusion**

Commerce's determination that 19 U.S.C. § 1677b(e)(2)(B)(iii) may reasonably be interpreted to require a positive amount for profit is inconsistent with Congress's intent, and therefore, not

in accordance with law.  The Court recognizes that Commerce is to be accorded substantial deference in interpreting the antidumping laws.  See Torrington Co. v. United States, 68 F.3d 1347, 1351 (Fed. Cir. 1995)(citing Daewoo Elecs. Co. v. Int'l Union, 6 F.3d 1511, 1516 (Fed. Cir. 1993), cert. denied, 512 U.S. 1204 (1994)).  Moreover, the Court acknowledges the SAA statement upon which Commerce relied in interpreting the CV provision as mandating a positive amount for profit.  See SAA at 839 ("Because constructed value serves as a proxy for a sales price, and because a fair sales price would recover SG&A expenses and would include an element of profit, constructed value must include an amount for SG&A expenses and for profit.").

Here, however, upon examination of the statute's language, legislative history, and structure, it is clear that Congress did not intend 19 U.S.C. § 1677b(e)(2)(B)(iii) to require a positive amount for profit where all available data demonstrate that sales in the same general category were made at below cost.  To the contrary, the Chevron step one analysis indicates that: 1) Congress intended to eliminate the profit minimum from the CV calculation in favor of actual amounts; 2) Congress intended that where sales are not made in the ordinary course of trade, they are not profitable; 3) Congress understood that where sales are not profitable, the actual amount of profit is zero; and 4) Congress intended that a fair comparison be made between the home market and U.S. prices.  While the CV provision may presume a positive amount for profit, it is clear that new URAA provision 19 U.S.C. § 1677b(e)(2)(B)(iii)

does not mandate the creation of a positive amount where all available evidence indicate non-profitable sales.

The record indicates that numerous Colombian producers made home market sales of the same general category of merchandise at below cost prices. Therefore, pursuant to § 1677b(e)(2)(B)(iii), the profit "normally realized" is zero, and zero is thus the profit cap. The Court remands the matter to Commerce for an application of the statute consistent with this standard.

**III. Commerce's Treatment of Imputed Credit Expense**

Credit expenses are the costs of financing sales accounts receivables. Imputed credit expenses, therefore, represent the amounts Commerce attributes to interest expenses incurred between shipment date and payment date. See Koenig & Bauer-Albert AG v. United States, 22 CIT ___, ___, 15 F. Supp.2d 834, 841 (1998).

Asocolflores argues that, because Commerce included all interest expenses in CV, while subtracting the imputed cost of credit from the EP and CEP, Commerce violated the statutory requirement of a fair comparison. See Asocolflores Br. at 29 (citing 19 U.S.C. § 1677b(a) and the Agreement, Art. 2.4). Asocolflores maintains that, "unless the statute expressly provides otherwise, if the export price is adjusted for an item of expense, normal value must also be adjusted for that item of expense." Id. Therefore, according to Asocolflores,

> To comply with the statute's requirement of a fair comparison, Commerce must either (i) exclude from CV that portion of actual financial expenses attributable to

sales (by subtracting from net financial expenses an amount determined by multiplying net financial expenses by the ratio of accounts receivable over total assets, as was its practice prior to the URAA), or (ii) subtract an amount for imputed credit from CV, as a circumstances of sale adjustment pursuant to 19 U.S.C. § 1677b(a)(6)(C)(iii), as it has done in more recent cases.

Id. at 32.

Commerce specifically stated in the Final Results, however, that "[a]ny differences in credit expense between the U.S. and foreign market are taken into account as a circumstance of sale adjustment[.]" Final Results at 53,300. The statute requires that constructed value be "increased or decreased by the amount of any difference . . . between the [U.S. Price] and [CV] . . . that is established to the satisfaction of the administering authority to be wholly or partly due to . . . differences in the circumstances of sale." 19 U.S.C. § 1677b(a)(6)(C). This Court has previously held that Commerce's treatment of imputed interest expenses as a circumstance of sale is in accordance with law. See Koenig & Bauer-Albert, 22 CIT at ___, 15 F. Supp.2d at 842. Therefore, Commerce's method for accounting for differences in credit expense treatment between CV and EP (and CEP) is in accordance with the statute's fair comparison requirement. The Court is unable to discern from the record, however, whether Commerce in fact did account for differences in credit expenses as a circumstance of sale.[15]

---

[15]At oral argument on January 12, 1999, counsel for Commerce cited certain adjustments to EP, but nevertheless was unable to confirm that the appropriate adjustments were made.

Asocolflores further contends that Commerce failed to exclude credit expenses associated with sales of subject flowers to the United States and third countries from CV.  See Reply Br. of Def.-Intervenors in Supp. of Mot. for J. on the Agency R. ("Asocolflores Reply Br.") at 10.  Asocolflores points to the questionnaire Commerce sent to respondents, which requests "total financial expenses . . . incurred in connection with the production and sale of all products."  See Asocolflores Br. at 29-30 (citing Dep't of Commerce Questionnaire (Pub. Doc. 42)(May 16, 1996) at D-39).  The statute requires that CV only include those selling, general, and administrative ("SG&A") expenses incurred "in connection with the production and sale of a foreign like product . . . for consumption in the foreign country[.]" 19 U.S.C. § 1677b(e)(2)(A)(emphasis provided).  Therefore, to the extent that Commerce includes credit expenses in connection with United States and third market sales in SG&A, that calculation would not be in accordance with law.

Commerce counters, however, that it did not include credit expenses to all markets in the CV calculation, but properly limited such expenses to home market consumption.  See Def.'s Mem. in Partial Opp'n to Def.-Intervenors' Mot. for J. on the Agency R. at 40.  According to Commerce, it treats credit expenses as a type of "selling expense" for purposes of SG&A.  See id. at 39.  In the Preliminary Results, Commerce explained that, "[r]egarding selling expenses, all respondents reporting sales of export quality flowers in the home market stated they had no selling expenses in that market.  Therefore, as facts otherwise available, we did not

include selling expenses for those respondents that had no home market sales." <u>Certain Fresh Cut Flowers From Colombia</u>, 62 Fed. Reg. 16,772, 16,777 (Dep't Commerce April 8, 1997)(preliminary results).  Thus, according to Commerce, because it did not include selling expenses in the calculation of SG&A, Commerce did not include credit expenses to all markets in SG&A.  <u>See</u> Def.'s Mem. in Partial Opp'n to Def.-Intervenors Mot. for J. on the Agency R. at 39-40.

"The orderly functioning of the process of review[, however,] requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained."  <u>SEC v. Chenery Corp.</u>, 318 U.S. 80, 94 (1943).  Commerce does not cite to record evidence confirming that it indeed accounted for differences in CV and EP (and CEP) as a circumstance of sale and treated credit expenses as "selling expenses" for purposes of SG&A.  The Court requires a more detailed account with citations to record evidence to sustain Commerce's arguments.  Therefore, the Court remands the matter to Commerce to provide a more detailed explanation of (1) whether it accounted for differences in credit expenses as a circumstance of sale and (2) its treatment of credit expenses to United States and third markets for the purpose of CV.

## IV. Commerce's Decision to Exclude Antidumping Surcharges Paid to Unrelated Consignees from CEP

Colombian producers sell most of their flowers in the United States on a consignment basis.  Following the entry of the

antidumping duty order in 1987, numerous consignees of subject flowers from Colombia began a practice of raising their United States prices by a surcharge to cover the antidumping duties. Asocolflores explains that such importers include an additional line item on their invoices that they refer to as an antidumping duty surcharge, "so that they can pay to Customs the amounts of estimated antidumping duty deposits and any actual antidumping duty assessments." See Asocolflores Br. at 33 (citing, e.g., Maxima July 12, 1996 Response (Pub. Doc. 78) at 3, 47).

During the period of review, Commerce decided to deduct the antidumping duty surcharge from the United States price in calculating CEP for unaffiliated consignees. See Final Results at 53,293. Commerce explained that, where the Colombian producer/exporter and consignee are not related,

> the payment to the consignment reseller for [antidumping] reserve surcharges does not accrue to [the producer/exporter]. Therefore, we have taken as our starting price the price charged by the unaffiliated consignment seller net of the [antidumping] reserve surcharge. This differs from our treatment of [antidumping] surcharges paid to affiliated consignment sellers, where the [antidumping] surcharge can be said to accrue to the affiliated producer/exporter.

Id. Thus, Commerce interprets the statute as requiring the inclusion of antidumping surcharges in CEP where the producer/exporter and consignee are unrelated. In reviewing Commerce's interpretation, the Court employs the two-step analysis of Chevron.

The statute provides that,

The term "constructed export price" means the price at

> which the subject merchandise is first sold . . . in the
> United States . . . by or for the account of the producer
> or exporter of such merchandise or by a seller affiliated
> with the producer or exporter, to a purchaser not
> affiliated with the producer or exporter, as adjusted
> under subsections (c) and (d).

19 U.S.C. § 1677a(b).

Commerce does not argue that antidumping surcharges are a cost to be adjusted pursuant to either subsection (c) or (d) of § 1677a. See Def.'s Mem. in Partial Opp'n to Def.-Intervenors' Mot. for J. on the Agency R. at 42. Rather, Commerce argues that it deducts antidumping surcharges charged by unaffiliated consignees because such charges are not a component of the "starting price" defined in § 1677a(b). See id. Commerce predicates its argument on Commerce's finding that, in the case of an unaffiliated consignee, the antidumping surcharge "does not accrue" to the producer exporter. See id. at 41 (citing Final Results at 53,293). Because the producer/exporter "did not receive or control the funds which comprised the [antidumping] reserve surcharge," Commerce argues, "it is apparent that the surcharge is not part of 'the price . . . at which the subject merchandise is first sold . . . by or for the account of the producer or exporter . . . .'" Id. (citing 19 U.S.C. § 1677a(b)).

The plain language of § 1677a(b) does not expressly require that the components of the "price at which the subject merchandise is first sold . . . in the United States" accrue to the producer. Commerce appears to argue that the "for the account of the producer or exporter" phrase expresses the requirement. See id. In

rebuttal, Asocolflores contends that,

> The condition 'for the account of the producer' modifies the verb 'sold,' not the noun 'price,' and the unaffiliated consignee plainly sold the flowers 'for the account of the producer.' Indeed, in a consignment transaction, the consignee does not ever take title to the flowers, and thus has nothing to sell for its own account. Rather, the unaffiliated consignee acts as [the producer's] agent.

Asocolflores Reply Br. at 14-15. In the context of a consignment arrangement, the "for the account of" language is not so ambiguous as to support Commerce's conclusion that it may reasonably interpret the statute as requiring all price components to accrue to the producer/exporter to be deemed elements of the starting price.

Moreover, Commerce's accrual requirement is inconsistent with the provision's language as a whole. Section 1677a enumerates numerous expenses, included in the starting price, that do not accrue to the producer, including international air freight, Customs' clearance fees, selling expenses, and other charges. Congress specifically required that these expenses be deducted from CEP in subsections (c)(2) and subsection (d). See 19 U.S.C. § 1677a(c)(2)-(d). Again, as these expenses comprise part of the starting price, they are included in the starting price. Therefore, if, as Commerce contends, Congress intended to restrict the CEP starting price to components of that price that actually accrue to the producer, the adjustments provided for in subsections (c)(2) and (d) would be superfluous. The canons of statutory construction provide that "[a] statute should be construed so that

effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant[.]" SUTHERLAND STAT CONST § 46.06 (5th ed. 1992). Commerce's interpretation of the provision would render its subsections superfluous; therefore, the Court concludes that Commerce's interpretation is contrary to Congress's intent.

Finally, the SAA provides that, "constructed export price will be calculated by reducing the price of the first sale to an unaffiliated customer in the United States by the amount of the following expenses[.]" SAA at 823. The price of the first sale in the United States includes the antidumping surcharge, and the surcharge is not listed as one of the adjusted expenses. Therefore, the legislative history indicates that the CEP should include the antidumping surcharge.

The statute's language and legislative history, examined according to the accepted canons of construction, indicate that Congress intended to include antidumping surcharges in the starting price whether or not the consignee is related to the producer/exporter. Therefore, Commerce's application of the provision is not in accordance with law. The Court remands for a determination consistent with Congress's intended meaning.

## V.   Commerce's Decision Not to Employ the Net Monetary Correction in Calculating CV

For the current review, Commerce requested and respondents provided information regarding the monthly net correction gain or

loss reflected in the respondents' financial statements.  See Questionnaire (Pub. Doc. 42)(May 16, 1996) at D-40.  The monetary correction "represents the net gain or loss to [a] company caused by inflation on its net exposed monetary assets and liabilities[.]"[16]  Final Results at 53,299.  According to Asocolflores, Colombian law requires companies to use the net monetary correction to adjust their financial expenses as a generally accepted accounting principle ("GAAP").  See Final Results at 53,299.

In calculating costs for the purposes of CV, the antidumping statute provides that,

> Costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise.

19 U.S.C. § 1677b(f)(1)(A)(1994).

In the current review, Commerce applied the Colombian net monetary correction in calculating the depreciation and amortization expense for CV, but rejected the adjustment in calculating financial costs.  See Final Results at 53,299-300. Asocolflores argues that the new statutory provision requires Commerce to use Colombian GAAP unless it makes a specific finding

---

[16]The net monetary correction equals the difference between monetary assets and liabilities, multiplied by the inflation rate.  Gains result from inflation's effect on monetary liabilities, such as accounts payable.  Losses are generated as inflation erodes the value of monetary assets, such as cash.

that Colombian GAAP does not "reasonably reflect the costs associat[ed] with the production and sale of the merchandise." See Asocolflores Br. at 38-39 (citing 19 U.S.C. § 1677b(f)(1)(A)). Therefore, Asocolflores contends that, because Commerce did not make a specific finding that the net monetary correction unreasonably distorted or misstated financial costs for purposes of the CV calculation, Commerce was required to adjust the respondents' financial expenses for the inflation correction. See Asocolflores Br. at 39.

Commerce argues that it recognized the statute's requirement that costs normally be calculated in accordance with a company's records kept pursuant to the home country's GAAP, but did not adjust for the monetary correction of respondents' financial expenses because that correction did not pertain to the cost of flower production. See Def.'s Mem. in Partial Opp'n to Def.-Intervenors' Mot. for J. on the Agency R. at 45-46. Thus, Commerce interprets § 1677b(f)(1)(A) as being limited to production costs.[17] The Court reviews Commerce's interpretation to determine whether it

---

[17]In the Final Results, Commerce explained that "the statute merely requires that [Commerce] include in its calculation of CV the cost of manufacturing 'which would ordinarily permit the production of the merchandise in the ordinary course of business.'" Final Results at 53,300. In making this assertion, however, Commerce only cites 19 U.S.C. § 1677b(e)(1) as authority. See id. Section 1677b(e)(1) provides that one of the components of CV is the "cost of materials and fabrication . . . employed in producing the merchandise[.]" 19 U.S.C. § 1677b(e)(1). Commerce fails in its discussion, however, to acknowledge § 1677b(e)(2), which provides that selling, general, and administrative expenses are also included in CV, and § 1677b(f)(1)(A), the relevant section at issue.

is in accordance with law.

     For the fifth, sixth, and seventh reviews, this Court
sustained Commerce's rejection of the monetary correction for
Asocolflores' financial expenses in calculating CV "[b]ecause the
monetary correction does not relate to flower production."
Asociacion, 22 CIT at ____, 6 F. Supp.2d at 876.  That decision,
however, concerned Commerce's practice under the pre-URAA statute.
Prior to the enactment of the URAA, Commerce's practice was "to
adhere to an individual firm's recording of costs in accordance
with GAAP of its home country if . . . satisfied that such
principles reasonably reflect the costs of producing the subject
merchandise."[18]  Certain Fresh Cut Flowers From Colombia, 61 Fed.
Reg. 42,833, 42,846 (Dep't Commerce Aug. 19, 1996)(emphasis
provided); see also Furfuryl Alcohol From South Africa, 60 Fed.
Reg. 22,550, 22,556 (Dep't Commerce May 8, 1995); Silicon Metal
From Brazil, 56 Fed. Reg. 26,977, 26,986 (Dep't Commerce June 12,
1991).

     This court has upheld Commerce's practice as limited to

---

[18]Commerce based its policy on the following excerpt from the
House Report to the Trade Reform Act of 1973:

     [I]n determining whether merchandise has been sold at
     less than cost, [Commerce] will employ accounting
     principles generally accepted in the home market of the
     country of exportation if [Commerce] is satisfied that
     such principles reasonably reflect the variable and
     fixed costs of producing the merchandise.

H. Rep. No. 93-571, 93rd Cong., 1st Sess. at 71 (1973).  See
Camargo Correa Metais, S.A. v. United States, 17 CIT 897, 898
(1993).

production costs.   See, e.g., Thai Pineapple Public Co., Ltd. v.
United States, 20 CIT ___, ___, 946 F. Supp. 11, 18 (1996), appeal
docketed, No. 97-1437 (Fed. Cir. May 15, 1997); Micron Technology,
Inc. v. United States, 19 CIT 829, 833, 893 F. Supp. 21, 28,(1995);
Camargo Correa Metais, S.A. v. United States, 17 CIT 897, 898
(1993).   But cf. Laclede Steel Co. v. United States, 18 CIT 965,
975 (1994)(characterizing Commerce's practice as used in connection
with the firm's "financial position or actual costs"); Ipsco, Inc.
v. United States, 22 CIT ___, ___, 701 F. Supp. 236, 238, n.3
(1988).

     The current provision, however, is clearly not limited to
production costs.   Nineteen U.S.C. § 1677b(f)(1)(A) adopted and
enhanced Commerce's pre-URAA practice, clarifying that Commerce
will calculate costs based on the records of the producer where
such records are in accordance with the home country's GAAP and
"reasonably reflect the costs associated with the production and
sale of the merchandise."   (Emphasis provided.)   Moreover, in
discussing § 1677b(f)(1)(A), the SAA states that "[c]osts shall be
allocated using a method that reasonably reflects and accurately
captures all of the actual costs in producing and selling the
product under . . . review."   SAA at 835 (emphasis provided).
Accordingly, because the statute's language and legislative history
indicate that Congress did not intend to limit § 1677b(f)(1)(A) to
production costs, Commerce's interpretation of the provision is not
permissible under the first prong of Chevron.

     The  proper  question,  then,  is  whether  the  respondents'

financial costs relate to the production and sale of the subject
flowers.  If so, Commerce would either have to apply the Colombian
monetary correction or explain how it would distort these costs.
See Borden, Inc. v. United States, 22 CIT ___, ___, 4 F. Supp.2d
1221, 1234 (1998)(holding that 19 U.S.C. § 1677b(f)(1)(A) "is
conditional, requiring Commerce to use the company's own
calculation only if satisfied with the accuracy of the cost
representations they render.").

The SAA clearly recognizes that financial costs may relate to
production costs in discussing § 1677b(f)(1)(A)'s scope:

> In determining whether to accept the cost allocation
> methods proposed by a specific producer, Commerce will
> consider the production cost information available to the
> producer and whether such information could reasonably be
> used to compute a representative measure of the
> materials, labor and other costs, including financing
> costs, incurred to produce the subject merchandise, or
> the foreign like product. . . . Also, if Commerce
> determines that costs, including financing costs, have
> been shifted away from production of the subject
> merchandise, or the foreign like product, it will adjust
> costs appropriately, to ensure they are not artificially
> reduced.

SAA at 835 (emphasis provided).

In addition, Commerce itself has recognized that financial
expenses in this review may relate to the production and sale of
the subject flowers.  As noted above, Commerce claims to treat
credit expenses as a type of "selling expense" for purposes of
SG&A.  See supra p.30 (citing Def.'s Mem. in Partial Opp'n to Def.-
Intervenors' Mot. for J. on the Agency R. at 39).  Credit expenses
are financial expenses.  Therefore, financial expenses may be
characterized as selling expenses.

Moreover, in its questionnaire to respondents, Commerce specifically requests "information regarding total financial expenses . . . incurred in connection with the <u>production and sale</u> of all products."  Dep't of Commerce Questionnaire (Pub. Doc. 42)(May 16, 1996) at D-39.  Therefore, it is clear that Commerce recognizes that financial expenses may relate to production and sale.

Therefore, unless Commerce can demonstrate that respondents' financial expenses do not relate to the production and sale of the subject flowers, Commerce must either apply the net monetary correction to the respondents' financing costs or explain how the adjustment distorts such costs.  The Court remands for Commerce to make a determination consistent with this standard.

## VI.  Commerce's Calculation and Application of the CEP Profit Ratio

Nineteen U.S.C. § 1677a(d)(3) instructs Commerce to deduct the profit allocated to various U.S. selling expenses from CEP.  Section 1677a(f) provides that "profit" for purposes of subsection (d)(3) is to be calculated by multiplying "total actual profit" by the ratio of "total United States expenses" to "total expenses" (the "CEP profit ratio").  <u>See</u> 19 U.S.C. § 1677a(f).[19]

---

[19]19 U.S.C. § 1677a(f) states,

(1) **In general**.  For purposes of subsection (d)(3), profit shall be an amount determined by multiplying the total actual profit by the applicable percentage.

(2) **Definitions**.  For purposes of this subsection:

A.    **Commerce's Decision Not to Include U.S. Credit Expenses in "Total Expenses"**

In calculating the CEP profit ratio, Commerce did not include U.S. credit expenses in its calculation of "total expenses," but did include U.S. credit expenses in "total United States expenses." See Asocolflores Br. at 45. Asocolflores argues that by including

---

(A) **Applicable percentage**.  The term "applicable percentage" means the percentage determined by dividing the total United States expenses by the total expenses.

(B) **Total United States expenses**.  The term "total United States expenses" means the total expenses described in subsection (d)(1) and (2).

(C) **Total expenses**.  The term "total expenses" means all expenses in the first of the following categories which applies and which are incurred by or on behalf of the foreign producer and foreign exporter of the subject merchandise and by or on behalf of the United States seller affiliated with the producer or exporter with respect to the production and sale of such merchandise:

(i) The expenses incurred with respect to the subject merchandise sold in the United States and the foreign like product sold in the exporting country if such expenses were requested by the administering authority for the purpose of establishing normal value and constructed export price.

(ii) The expenses incurred with respect to the narrowest category of merchandise sold in the United States and the exporting country which includes the subject merchandise.

(iii) The expenses incurred with respect to the narrowest category of merchandise sold in all countries which includes the subject merchandise.

(D) **Total actual profit**.  The term "total actual profit" means the total profit earned by the foreign producer, exporter, and affiliated parties described in subparagraph (C) with respect to the sale of the same merchandise for which total expenses are determined under such subparagraph.

U.S. credit expenses in "total United States expenses," but not in "total expenses," Commerce impermissibly over-allocated profit to "total United States expenses" in violation of the plain language of 19 U.S.C. § 1677a(f).  See id. at 45-46.

As Asocolflores correctly demonstrates, credit expenses are included in "total United States expenses" under § 1677a(f)(2)(B) because credit expenses are deducted from CEP pursuant to § 1677a(d)(1)(B).  See id. at 45.  According to Asocolflores, credit expenses must also be included in "total expenses" because, pursuant to § 1677a(f)(2)(C)(i), "[t]he expenses incurred with respect to the subject merchandise sold in the United States" must necessarily include U.S. credit expenses.  See id. at 46.

Commerce has provided no reasoned basis for its decision not to include U.S. credit expenses in "total expenses."  Therefore, the Court remands to Commerce to reconsider this issue.

**B.    Commerce's Decision Not to Deduct Credit Expense from "Total Actual Profit"**

According to Asocolflores, Commerce did not deduct credit expense in calculating "total actual profit."  See Asocolflores Br. at 46.  Asocolflores reasons that, since credit expense is considered a United States expense, it must also be treated as an expense for purposes of calculating "total actual profit."  See id. "It makes no sense to allocate profit to credit expense while not considering credit an expense for purposes of calculating that profit."  Id.

The Court is unable to discern from the record whether

Commerce in fact did fail to calculate "total actual profit" net of credit expenses. Moreover, Commerce has not provided a reasoned response to Asocolflores' argument. Therefore, the Court remands the matter, instructing Commerce to reconsider and explain its treatment of credit expenses in calculating "total actual profit."

**C.  Commerce's Decision to Compute the CEP Profit Ratio on an Annual Rather Than on a Monthly Basis**

For purposes of CEP profit under 19 U.S.C. § 1677a(f), Commerce calculated the rate on an annual, rather than on a monthly, basis. See Final Results at 53,295. As Asocolflores concedes, neither the provision nor its legislative history indicates Congress's specific intent with regard to the time period over which the CEP profit rate is to be allocated. See Asocolflores Br. at 48. Therefore, the Court reviews whether Commerce's construction is reasonable under the second prong of Chevron.

Asocolflores argues that Commerce's use of an annual rate is unreasonable "because it does not fulfill the purpose of the statute of equilibrating constructed export price with export price." See Asocolflores Br. at 48-49 (citing SAA at 823 ("The deduction of profit is a new adjustment in U.S. law, consistent with the language of the Agreement, which reflects that constructed export price is now calculated to be, as closely as possible, a price corresponding to an export price between non-affiliated exporters and importers.")). Asocolflores points out that, due to specific flower-giving holidays, the demand for fresh cut flowers

in the United States--and consequently the profits arising therefrom--vary significantly from month-to-month. See id. at 49. Therefore, Asocolflores contends, "[t]he resulting constructed export price does not resemble 'as closely as possible' contemporaneous export prices, because the profit rate on export prices also vary with flower-giving holidays, and are not constant year-round." Id. at 50.

Asocolflores' argument is not persuasive. First, as FTC argued before Commerce, an average rate of profit still inherently accounts for monthly variation. See Final Results at 53,295. Second, Asocolflores fails to explain how use of an annual profit rate for CEP violates the statute's objective of corresponding CEP with EP.

Asocolflores also contends that Commerce failed to provide a reasoned response for its decision. See Asocolflores Br. at 51. The Court disagrees. In the Final Results, Commerce pointed out that the CEP profit calculation, as defined by § 1677a(f), "is not intended to be based on the profit of particular U.S. sales." Final Results at 53,295. Moreover, based on the provision's use of the term "total actual profit," Commerce explained that it interprets the statute to normally require an overall profit for home market and United States sales. See id. Therefore, Commerce "use[s] an average profit rate for those U.S. and home market sales that were made." Id.

Nineteen U.S.C. § 1677a(f) explains that CEP profit is to be calculated by multiplying "total actual profit" by the ratio of

"total United States expenses" to "total expenses."  Both "total actual profit" and "total expenses" include data for both U.S. and home market sales.   See 19 U.S.C. § 1677a(f)(2)(C) & (D). Therefore, Congress clearly did not intend for CEP profit to be based on U.S. sales alone.  Morever, the Court finds Commerce's interpretation of "total actual profit" to indicate the presumption of a single profit rate to be reasonable.  Cf. Toyota Motor Sales, U.S.A., Inc. v. United States, 22 CIT ___, ___, 15 F. Supp.2d 872, 891 (1998)(upholding Commerce's construction of 19 U.S.C. §§ 1677a(d)(3) and (f) as requiring a single, aggregated CEP profit even where there are multiple lines of subject merchandise and foreign like product).   Therefore, based on the terms of the provision, the Court finds Commerce's interpretation to be reasonable.

The Court sustains Commerce's determination to calculate CEP profit as a single, annual rate.


**VII. Commerce's Decision to Impute a Consolidated General and Administrative Expense Rate for All Farms of the HOSA Group in Calculating the Cost of Production for CV**

"The HOSA Group consists of several related companies dedicated to the production and sale of fresh cut flowers[.]" See HOSA's July 12, 1996 Response (Pub. Doc. 75) at A-9.  Only one of the HOSA Group companies, Innovacion Andina, S.A., performs bouquet operations on top of growing flowers subject to the antidumping duty order.  See id.  To make the bouquets, Innovacion Andina purchases flowers from non-HOSA Group farms.  See Asocolflores Br.

at 52.  For purposes of the ninth administrative review, Commerce treated the farms of the HOSA Group as a single entity.  See Final Results at 53,300-301.  Therefore, in calculating the costs for computing CV, Commerce applied a consolidated rate of general and administrative ("G&A") expenses for the entire group, which was the average of each farm's separate G&A expense.  See id. at 53,301.

Asocolflores argues that Commerce's G&A expense methodology for the HOSA Group "is unlawful under the second prong of the Chevron standard because it fails to fulfill the statutory purpose of calculating dumping margins using the most accurate information available."  Asocolflores Br. at 53.  According to Asocolflores, because Innovacion was the only HOSA Group farm to purchase flowers for bouquet operations, and because its G&A expense rate was significantly lower than those of the other HOSA Group farms, Commerce should have used Innovacion Andina's separate G&A expense rate, rather than applying the HOSA Group average.  See id. at 52-53.

Commerce argues that its use of a single, average G&A expense rate for the HOSA Group is consistent with the agency's collapsing and G&A expense allocation practices, both of which have been sustained by this Court.

Adhering to its collapsing practice, Commerce treated the HOSA Group as one company, since it is composed of several related companies.  See Def.'s Mem. in Partial Opp'n to Def.-Intervenors' Mot. for J. on the Agency R. at 52.  This Court has held that Commerce's decision to define "company" to include several closely

related companies is a permissible application of the antidumping statute.  See Queen's Flowers de Colombia v. United States, 21 CIT ___, ___, 981 F. Supp. 617, 622 (1997).[20]

Moreover, in calculating a company's G&A expenses, Commerce finds the ratio of the company's total G&A expenses relative to the total cost of goods sold by the company and applies this ratio to the cost of manufacture of each product.  See Final Results at 53,300.  In other words, Commerce treats G&A expenses as "expenses incurred for the operation of the corporation as a whole and not directly related to the manufacture of a particular product."  Id. This Court has recognized that G&A expenses relate to the activities of a company as a whole.  See U.S. Steel Group, 22 CIT at ___, 998 F. Supp. at 1154.[21]

Therefore, Commerce's calculation of a single G&A expense rate for the HOSA Group is consistent with the agency's affirmed practices of treating related companies as a single entity and calculating the G&A expenses for a company as a whole.  Moreover, Commerce's calculation of the HOSA Group G&A expense rate is consistent with the objective of promoting accuracy in the determination of dumping margins.  Commerce explained that it does "not allow companies to pick and choose which G&A expenses and

---

[20]Although the Queen's Flowers decision involved pre-URAA law, the amended provision does not mandate a different conclusion.

[21]Although the U.S. Steel decision involved the pre-URAA law, the amended provision does not mandate a different conclusion because the definition of G&A expenses has not changed.

which divisions of the company will be used in accounting for this expense." Final Results at 53,301. If Commerce treated Innovacion Andina's bouquet operation G&A expenses as distinct from the rest of the HOSA Group's G&A expenses, it would improperly overstate the HOSA Group's G&A expense rate. Therefore, Commerce's calculation of a consolidated G&A expense rate for the entire HOSA Group is a reasonable application of the statute. The Court sustains Commerce's practice.


## Conclusion

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now in conformity with said decision it is hereby

ORDERED that the Department of Commerce's final determination in <u>Certain Fresh Cut Flowers From Colombia</u>, 62 Fed. Reg. 53,287 (Dep't Commerce, Oct. 14, 1997) is sustained in part and remanded in part; and it is further

ORDERED that the issue of Commerce's instruction to respondents not to offset expenses with interest income in calculating indirect selling expenses is remanded for reconsideration and to allow respondents to submit information concerning the interest income offset and for Commerce to make adjustments to constructed export price, as appropriate, based upon this information; and it is further

ORDERED that the issue of Commerce's rejection of the constructed value "profit cap" in calculating constructed value is

remanded for Commerce to apply 19 U.S.C. § 1677b(e)(2)(B)(iii) in a manner consistent with this Court's opinion; and it is further

ORDERED that the issue of Commerce's decision to deduct imputed credit expenses from U.S. price but not from constructed value is remanded for Commerce to reconsider and to provide a more detailed explanation of whether it accounted for differences in credit expenses as a circumstance of sale and of its treatment of credit expenses to U.S. and third markets for the purpose of constructed value; and it is further

ORDERED that the issue of Commerce's decision to exclude antidumping surcharges paid to unrelated consignees from constructed export price is remanded for a determination consistent with this Court's opinion; and it is further

ORDERED that the issue of Commerce's decision not to employ the Colombian net monetary correction in calculating constructed value is remanded for Commerce to either apply the net monetary correction to the respondents' financing costs or to explain how the adjustment distorts such costs unless Commerce can demonstrate that the respondents' financing expenses do not relate to the production and sale of the subject flowers; and it is further

ORDERED that the issue of Commerce's decision not to include U.S. credit expenses in "total expenses" is remanded for reconsideration; and it is further

ORDERED that the issue of Commerce's decision not to calculate "total actual profit" net of credit expense is remanded for reconsideration and for Commerce to explain its treatment of credit

expenses in calculating "total actual profit;" and it is further

ORDERED that remand results are due on Monday, March 29, 1999; comments and responses thereto are due on Wednesday, April 28, 1999; any rebuttal comments are due on Thursday, May 13, 1999; and it is further

ORDERED that Commerce's final determination is sustained in all other respects.

_____
                                          Donald C. Pogue
                                               Judge

Dated:     January 27, 1999
           New York, New York